UNITED STATES

v.

Raymond EDWARDS, David Richards, Irvin Zide and Jean Wallace.

CR 76–314–T.

United States District Court, D. Massachusetts.

Dec. 5, 1977.

James E. O'Neil, Asst. U. S. Atty., for the United States.

Jack I. Zalkind, Ronald J. Chisholm, Christopher Dye, Crane & Inker, Willie J. Davis, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

TAURO, District Judge.

Defendants Raymond Edwards, David Richards and Irvin Zide are charged in a

two count indictment with conspiracy and possession of heroin with intent to distribute. Defendant Wallace is named in a misdemeanor information for simple possession of heroin.

Before the court are two distinct motions to suppress. In one, defendants Edwards, Richards and Zide jointly move to suppress a package, allegedly containing several ounces of heroin, that was seized at a residence in Randolph, Massachusetts. In the second, defendant Wallace seeks to suppress a small packet of heroin seized from her, and statements she made while she was in custody in the U.S. Marshal's lock-up.

On the basis of the evidence and arguments presented, this court denies the joint motion to suppress the package, but allows Wallace's motion to suppress the packets and statements.

## I. FACTS

On July 15, 1976 an unidentified man, allegedly defendant Zide, approached the shipping counter of United Airlines in Los Angeles. He was carrying a package addressed to David Richards in South Boston, Massachusetts (Richards package) which he wanted to send by United to Boston. At the counter, the man spoke with Robert Newlands, a Customer Service Agent (C.S.A.) employed by the airlines. The man filled out a shipping slip, paid a $42.00 fee in cash, and declared that the package contained "film." Newlands took the package from the man and, rather than immediately processing it, placed it on the counter while he serviced another customer. At that point, the man left the counter and was observed by C.S.A. Newlands and his colleague, C.S.A. Morris, to act in a manner they deemed suspicious. After leaving the counter, the man hid behind a post in the terminal, apparently seeking to watch the agents and the package without being seen. He then proceeded to a crowded lobby, some 560 feet from the counter, where he stood near the terminal exit and continued to observe the scene from that vantage point for three or four minutes. The man next exited the building and resumed his surveillance through the windows for several more minutes. Reacting to their suspicions, one of the C.S.A.'s removed the package from the counter. Their last view of this man was as he ran across the street in front of the terminal, pausing on the median strip to glance back into the building.

Because of the suspicious behavior exhibited by the man, C.S.A. Morris feared that the package might contain "hazardous material," as defined by C.A.B. Tariffs, which could not be shipped through his facility. Morris, therefore, decided to open the package, pursuant to Rule 24 of Official Airfreight Rules Tariff, No. 1–B C.A.B. No. 96, which provides,

*Inspection of Shipments*—All shipments are subject to inspection by the carrier, but the carrier shall not be obligated to perform such inspection.

Morris opened the package in his supervisor's office. Inside, he found four sealed clear plastic bags containing a brown substance.

The supervisor then called the Los Angeles Police Department. Shortly thereafter, Officer Celmer of the L.A.P.D. Narcotics Division appeared at the supervisor's office. Morris told Celmer that he had opened the Richards package because he feared that it might contain hazardous materials, perhaps flammables or even explosives. When Celmer first observed the package, it was open and contained four plastic bags. He removed the package to a police substation at the airport where a field test on the contents of the bags indicated that they contained heroin. Celmer then contacted the FBI in Boston concerning the package. He was referred to DEA Special Agent Richard O'Connor. In four phone calls on the evening of July 15, 1977, Celmer explained to O'Connor the circumstances leading up to his possession of the Richards package. When Celmer expressed a desire to convoy the package, O'Connor advised him that such an interstate shipment was within the jurisdiction of the FBI and that Celmer should contact the FBI in Los Angeles to carry out the convoy. Celmer reached FBI Agent Roberts in L.A. and turned over to

him eight of the ten ounces from the package.

The Los Angeles FBI then executed a controlled delivery of the Richards package to Boston, where it was placed for pick-up at the United Airlines terminal of Logan Airport on the morning of July 16. At approximately 10:40 a. m. on that day, DEA agents observed an unidentified man, later identified as David Richards, pick up the package. The agents continued to follow the man as he travelled by bus and then car to a residence in Randolph, Massachusetts.[1]

An FBI agent witnessed the man pull up in front of 27 Eugenia Street, Randolph, where defendant Edwards was observed to meet him. The two men went to the trunk of the car and removed the Richards package. At that point, there was some conversation between the two men, and Edwards gestured toward FBI Agent Murphy, who was at a nearby surveillance post, causing Murphy to worry that Edwards, with whom he was acquainted, had recognized him. The men then entered the residence, with Edwards carrying the package.

Shortly thereafter, at approximately 11:35 a. m., the agents were given radio instructions to make an entry. As they moved toward the door, one of the agents heard the sound of running water. Several agents then entered the residence through an unlocked door, without a warrant or permission. The lead agent had his gun drawn. As they entered the house, one agent determined that the sound of running water came from either the sink or the dishwasher.

The agents discovered a group of people, including Edwards, Richards and Wallace, sitting in the kitchen. There was a stove in the room. Two of the defendants, Edwards and Richards, were put up against a wall and frisked. Edwards was then handcuffed. The agents conducted a "body search" of the house, but did not look for or seize the package at that time. For the next one and one-half hours, the agents "secured" the house. They acknowledged that they would not have permitted anyone to leave the premises.

Meanwhile in Boston, FBI Agent Simpkins and an Assistant United States Attorney went to a magistrate to obtain a warrant to search the premises of 27 Eugenia Street. In an affidavit filed in support of the warrant application, Simpkins recounted the occurrences of the past two days, including the very recent developments in Randolph. Much of the information he recounted was identified as information concerning events in Los Angeles which he had received from Agent O'Connor, based on O'Connor's conversations with Agent Celmer. As of July 16, Simpkins had not spoken with Celmer directly. In the affidavit he stated that,

> Officer Celmer advised SA O'Connor that he (Celmer) carefully opened the parcel, as he was concerned it may contain an explosive device, that upon opening the parcel he observed the contents to be four (4) cellophane bags containing a brown powdered substance weighing approximately ten (10) ounces.

The magistrate issued a warrant, based upon Simpkins' affidavit, shortly after noon on July 16.

Word that the warrant had been issued was radioed to the agents at 27 Eugenia Street. They proceeded to search the premises at about 1:15 p. m. on that day. The Richards package was discovered on a shelf in a pantry adjoining the kitchen—several feet from the defendants. The package had been slit open. Subsequent to the search, those present in the kitchen were placed under arrest, without authorizing warrant, and transported to the Federal building in Boston. Among those arrested were defendants Richards, Edwards and Wallace.

---

1. There was no live evidence produced at the hearing on defendants' motions to suppress establishing the surveillance from Logan Airport to Randolph. The court has, however, drawn upon uncontradicted evidence of that surveillance in an affidavit filed by Agent Simpkins with a magistrate on July 16, 1976. That affidavit was admitted into evidence generally by the court at the suppression hearing, without objection.

At the Federal building, defendant Wallace was placed in the Marshal's lock-up where Agent Patricia Meade performed a strip search on her without a search warrant. The agent discovered a small packet in Wallace's clothes. Without informing Wallace of her rights, Meade asked her what the packet was. Wallace replied that she had been trying to get rid of it since the time of her arrest, and that it was for somebody in South Boston. The government alleges that the packet contained .27 grams of heroin.

On July 21, 1976 Agent Simpkins filed with the magistrate an "Amended Affidavit" that attempted to correct a misstatement in the July 16 affidavit. In the second affidavit, Simpkins stated that he had talked directly to Officer Celmer for the first time on July 19. During that conversation, it was revealed to Simpkins that C.S.A. Morris, rather than Celmer had opened the Richards package based on concerns for its contents. The magistrate noted on the amended affidavit that it was "denied insofar as this affidavit is offered after the warrant was executed."

On February 17, 1977 this court conducted a hearing on defendants' motions to suppress. At the hearing there was a great deal of evidence introduced as to the circumstances surrounding the discrepancy between the two affidavits. It is clear from the testimony, however, that it was Morris, not Celmer, who initially opened the package. The confusion may have stemmed from the fact that Celmer did subsequently open the package. Furthermore, the testimony indicated that Celmer thought he had told O'Connor that Morris had initially opened the package, whereas O'Connor believed that he was told that Celmer initially opened the package. It is evident that all the information which Simpkins received about events in Los Angeles was filtered through O'Connor.

On the basis of the evidence presented, the court finds that the misstatement in Simpkins' original affidavit was made in good faith. There is no evidence which would lead to the conclusion that the affiant had any intention to deceive the magistrate or to pad an otherwise inadequate affidavit.[2] Furthermore, the evidence did not even show that Simpkins lacked due care in filing his affidavit. Defendants' theory that Simpkins should have thoroughly cross-checked all his information before putting it into his affidavit is unacceptable. That suggestion ignores the demanding time constraints which operate on agents under such circumstances. This court therefore concludes that Simpkins' misstatement was neither reckless or negligent.

## II. MOTION TO SUPPRESS BY DEFENDANTS EDWARDS, RICHARDS AND ZIDE

Defendants Edwards, Richards and Zide propose five distinct theories for the suppression of the Richards package: A. they argue that the initial affidavit indicates that the package was opened by unconstitutional means and that, therefore, the warrant was invalid; B. assuming that the package was opened in Los Angeles by airline employees, they claim that that was the equivalent of government conduct, invalid under the fourth amendment; C. defendants suggest that the search warrant was invalid because it depended on a material misstatement of fact in the first affidavit; D. Simpkins' failure to put a time frame around the information recited in his first affidavit is argued as a ground for invalidating the warrant; and E. defendants allege that the package is the fruit of the agents' unconstitutional entry into the Randolph residence. I will deal with these arguments seriatim.

### A.

Defendants' first argument focuses on the fact that the July 16 Simpkins affidavit asserts that Officer Celmer initially opened the Richards package at the Los Angeles airport. From that assertion, two separate

---

2. It is difficult to imagine why such a misstatement would have been intentionally made, given that it tended to weaken rather than strengthen the affidavit.

arguments are made for the suppression of the package: 1. if Celmer opened the package first, it must be excluded as the fruit of a warrantless search; and 2. the warrant was invalid because the magistrate issued it on the basis of an affidavit asserting an unconstitutional search apparent on its face.

■ Neither of these two theories is persuasive. The first theory is defeated by the factual finding that Morris made the initial search. The second theory misconstrues the function of a magistrate in issuing search warrants. His function is to determine whether the government has presented sufficient evidence to establish probable cause for the issuance of a warrant. His job is not to decide whether that evidence was obtained by constitutional means. Such decisions are reserved for trial courts at motions to suppress.

### B.

Defendants' second argument assumes that Morris initially opened the Richards package in Los Angeles, and that he did so as a government agent. From these assumptions, they reason that the package and its contents must be suppressed as the fruits of a warrantless search. The foundation of this theory is that Morris' conduct constituted governmental action because it was pursuant to Rule 24 of the C.A.B. Tariffs.

The court is cognizant of a line of cases which holds that under certain circumstances, searches carried out by airline personnel constitute government action subject to the constitutional restraints imposed on government searches. *United States v. Canada,* 527 F.2d 1374 (9th Cir. 1975), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976); *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973); *Corngold v. United States,* 367 F.2d 1 (9th Cir. 1966). All of those cases are distinguishable, however, from the instant case in that they show a much greater degree of governmental involvement in the search than is present here. In both the *Canada* and *Davis* cases, the searches were performed by airline personnel pursuant to a government *mandate* that all carry-on luggage be inspected as part of the recent anti-hijacking campaign. Similarly, in *Corngold,* a search was conducted by TWA employees at the request of federal agents. On those facts the courts had little trouble concluding that private parties were acting as "agents or instruments" of the government within the meaning of *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ The facts here show that Morris was not subject to federal mandate or request. On the contrary, he opened the package on his own initiative, for airline purposes, and pursuant to a C.A.B. rule which permitted, but explicitly did not require, such searches. The facts of this case are controlled by a line of authority led by *United States v. Pryba,* 163 U.S.App.D.C. 389, 502 F.2d 391 (1974), *cert. denied,* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975). In that case, a defendant appealed his conviction for receiving obscene materials. The materials had been deposited at a United Airlines counter for shipment from San Francisco to Denver. When the man depositing the package appeared nervous and failed to give satisfactory answers as to the contents of the package, the airline employee opened the package and found pornographic materials. In a motion to suppress, and subsequently on appeal, the defendant argued that the employee's actions should be analyzed as government conduct subject to the requirements of the fourth amendment. He further argued that Rule 24 was unconstitutional. The D.C. Circuit responded,

Where the search is made at the behest of or with the assistance of law enforcement officers, there must be probable cause, and in appropriate instances an authorizing warrant, if the search is to pass constitutional muster. But where the search is made on the carrier's own initiative for its own purposes, Fourth Amendment protections do not obtain for the reason that only the activities of individuals or nongovernmental entitles are involved. So frequently and so emphati-

cally have the courts enunciated and applied these principles that, at least for the time being, they must be regarded as settled law.

163 U.S.App.D.C. at 396, 502 F.2d at 398 (footnotes omitted).

In the recent case of *United States v. Fannon,* 556 F.2d 961 (1977), the Court of Appeals for the Ninth Circuit held that under the provisions of another statute, 49 U.S.C. § 1511,[3] a search of an air freight package by employees of a carrier, on their own initiative, constituted governmental action for fourth amendment purposes. The court reasoned that the carrier was authorized by section 1511 to conduct searches as part of the government's air transportation security program, and determined that the statute thereby conferred on the carrier a governmental function sufficient to subject its activities to constitutional limitation.

Section 1511 was originally promulgated as part of the Air Transportation Security Act of 1974. H.R.Rep.No.93–1194, 93d Cong., 2d Sess., U.S.Code Cong. & Admin. News 1974, p. 4010. That act was known as Title II of P.L. 93–366. Its stated purpose was to provide,

security against acts of criminal violence directed against air transportation through the imposition at airports in the United States of such measures as the screening of passengers and requiring (sic.) the presence of adequately trained law enforcement personnel.

H.R.Rep.No.93–885, 93d Cong., 2d Sess., U.S.Code Cong. & Admin.News 1974, p. 3976.

Although section 1511, on its face, might be read to authorize the inspection of air freight shipments, its legislative history demonstrates a congressional intent to deal with a related, but different problem, that of air piracy. *See* H.R.Rep.No.93–885, 93d Cong., 2d Sess., U.S.Code Cong. & Admin. News 1974, p. 3975 *et seq. See also Air Line Pilots Association, International v. C.A.B.,* 516 F.2d 1269, 1275 n. 10 (2d Cir. 1975) (obvious from face of statute that Congress' chief concern in enacting section 1511 was to provide protection against danger of hijacking). Moreover, the sole regulation promulgated under section 1511[4] authorizes the search of passengers and their carry-on or checked baggage. It does not explicitly provide for inspection of air

---

3. 49 U.S.C. § 1511 provides:

(a) The Administrator shall, by regulation, require any air carrier, intrastate air carrier, or foreign air carrier to refuse to transport—

(1) any person who does not consent to a search of his person, as prescribed in section 1356(a) of this title, to determine whether he is unlawfully carrying a dangerous weapon, explosive, or other destructive substance, or

(2) any property of any person who does not consent to a search or inspection of such property to determine whether it unlawfully contains a dangerous weapon, explosive, or other destructive substance.

Subject to reasonable rules and regulations prescribed by the Administrator, any such carrier may also refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.

(b) Any agreement for the carriage of persons or property in air transportation or intrastate air transportation by an air carrier, intrastate air carrier, or foreign air carrier for compensation or hire shall be deemed to include an agreement that such carriage shall be refused when consent to search such persons or inspect such property for the pur-

poses enumerated in subsection (a) of this section is not given.

4. 14 C.F.R. 121.538 provides in part:

(b) Each certificate holder shall adopt and put into use a screening system, acceptable to the Administrator, that is designed to prevent or deter the carriage aboard its aircraft of any explosive or incendiary device or weapon in carry-on baggage or on or about the persons of passengers, except as provided in § 121.585, and the carriage of any explosive or incendiary device in checked baggage.

. . .

(k) Each certificate holder shall refuse to transport—

(1) Any person who does not consent to a search of his person in accordance with the screening system prescribed by paragraph (b) of this section; and

(2) Any property of any person who does not consent to a search or inspection of that property in accordance with the screening system prescribed by paragraph (b) of this section.

freight except insofar as shipped materials might be considered "checked baggage."

The statute was enacted as companion legislation to the Anti-Hijacking Act of 1974. *See* H.R.Rep.No.93–885, 93d Cong., 2d Sess., U.S.Code Cong. & Admin.News 1974, p. 3975 *et seq.* Its legislative history indicates clearly a congressional purpose to

> provide a law enforcement presence and capability at United States airports . . . adequate to insure safety from criminal violence and air piracy in air transportation.

*Id.* at 4008. The terms "aircraft piracy" and "hijacking" are used interchangeably throughout the legislative history and are clearly synonymous. *See e. g.* H.R.Rep.No. 958, 87th Cong., 1st Sess., U.S.Code Cong. & Admin.News 1961, p. 2567; H.R.Rep.No.93–885, 93d Cong., 2d Sess., U.S.Code Cong. & Admin.News 1974, p. 3976. As defined by 49 U.S.C. § 1472(i)(2), aircraft piracy means,

> any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation . . . of an aircraft . . . .

*See also* H.R.Rep.No.958, 87th Cong., 1st Sess., U.S.Code Cong. & Admin.News 1961, p. 2567. Common sense dictates that seizure of an aircraft requires the presence on board the carrier of the person attempting to gain control of the plane. To that extent, shipment by air freight, even of an explosive, does not present a threat of hijacking or air piracy.

It is clear, therefore, that 49 U.S.C. § 1511 was passed as part of a congressional effort to statutorily provide security against hijacking attempts, and was not intended to cover shipments of air freight by persons who were not passengers. Insofar as *Fannon* may be deemed to be persuasive, but not binding, precedent to the contrary, this court respectfully declines to follow its holding for the reasons outlined above.

For these reasons this court determines 49 U.S.C. § 1511 to be inapposite to the factual circumstances of this case. It is unnecessary, therefore, to reach the question of whether consent to search was granted, implied, or even required.

### C.

A third theory for suppression is predicated on the misstatement in the first affidavit. Defendants argue that it was a misstatement material to the establishment of probable cause which must be excised from the affidavit. They assert that after excision, there is insufficient evidence to find probable cause for the issuance of the warrant and, therefore, the package must be suppressed as the fruit of an invalid warrant.

In responding to this argument, the court is without guidance from the Supreme Court as to the correct approach to misstatements of fact in affidavits supporting search warrants. *See Rugendorf v. United States,* 376 U.S. 528, 531–32, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). The First Circuit Court of Appeals spoke to one aspect of the problem in *United States v. Belculfine,* 508 F.2d 58 (1st Cir. 1974), a case involving alleged misstatements in affidavits filed by postal inspectors in support of a search warrant application.[5] The court held that where there is an intentional, relevant and nontrivial misstatement in an affidavit, the fruits of a warrant obtained by means of that affidavit must be suppressed, regardless of whether the intent was to deceive the magistrate or merely to round out an affidavit. *United States v. Belculfine,* 508 F.2d at 63. The court rejected the option of merely excising the identified misstatements as inconsistent with its goal of deterring intentional police misconduct. It expressly declined, however, to suggest a remedy for unintentional, negligent and material mis-

---

**5.** Although the court of appeals in *Belculfine* assumed that there were misstatements in the postal affidavit, on remand, the district court, after hearing further evidence, found that there

was no such misstatement in the affidavit. *United States v. Belculfine,* 395 F.Supp. 7 (D. Mass. 1975). On a second appeal, the circuit

statements. *United States v. Belculfine*, 508 F.2d at 62.[6]

Other courts of appeal have addressed the affidavit misstatement problem with varying results. The Courts of Appeal for the Fourth, Sixth, Seventh and Eighth Circuits, following a deterrence rationale, hold that fruits must be suppressed only where a misstatement is either intentional or reckless and material. *United States v. Lee*, 540 F.2d 1205, 1208–09 (4th Cir.), *cert. denied*, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976); *United States v. Luna*, 525 F.2d 4 (6th Cir. 1975), *cert. denied*, 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976); *United States v. Marihart*, 492 F.2d 897 (8th Cir.), *cert. denied*, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); *United States v. Carmichael*, 489 F.2d 983 (7th Cir. 1973). The Fifth and Tenth Circuit Courts of Appeal are stricter—they order suppression whenever there is an intentional or material misstatement. *United States v. Astroff*, 556 F.2d 1369 (5th Cir. 1977); *United States v. Harwood*, 470 F.2d 322 (10th Cir. 1972).

■ The facts of this case do not require the court to enter into the controversy that divides the circuits. Having already found that Simpkins' misstatement was neither intentional nor negligent, the court now finds that the misstatement was nontrivial, but not material, in the "but for" sense of the word as used by the First Circuit. Even if the misstatement is excised—the identity of the party who initially opened the package in Los Angeles—the affidavit still contains sufficient facts for a finding of probable cause. It describes the nervous and suspicious behavior of the man at the airport as observed by Morris. It describes the opening of the package and the discovery of a substance later identified as heroin. It describes the controlled delivery of the package to Boston and the surveillance that traced the package to 27 Eugenia. And it describes the criminal involvement of some of those present at the house.

No circuit court of appeals has gone so far as to require suppression of fruits obtained by an otherwise sufficient warrant that happened to contain a good faith, nontrivial misstatement of fact.

### D.

■ Defendants' fourth argument is that the July 16 affidavit did not justify issuance of the warrant because it failed to state the time at which the recited information was received. The argument is built around *Rosencranz v. United States*, 356 F.2d 310 (1st Cir. 1966). In that case, the First Circuit found an affidavit inadequate because it was a

> combination of undated, conclusory information from an anonymous source and an undated general allegation of personal observation by the affiant, with no other reasonably specific clues to the time of their happening . . . . .

356 F.2d at 318.

In rejecting this argument, the court need only observe that the July 16 affidavit does not contain vague, undated information which might lead to the issuance of a warrant based on stale information. On the contrary, the disputed affidavit adequately sets a time frame of July 15 and 16, 1976 for its reasonably specific assertions.

### E.

■ Defendants' final argument is that the package must be suppressed because it was the fruit of an illegal entry into 27 Eugenia Street. Assuming, *arguendo*, that the agents' entry was illegal, suppression is still unwarranted because the package was not fruit of that entry. At the suppression hearing, it was uncontradicted that the agents neither searched for, nor seized the package until *after* a warrant had been issued. The package was, therefore, seized as the fruit of the warrant, and was untainted by the alleged illegality of the entry. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

---

court adopted that finding. *United States v. Belculfine*, 527 F.2d 941 (1st Cir. 1975).

**6.** The court took the term "material" to mean "but for essential" to the establishment of probable cause. *United States v. Belculfine*, 508 F.2d at 62.

#### F.

For all of the above reasons, the court concludes that the motion to suppress of defendants Edwards, Richards and Zide must be denied.[7]

### III. MOTION TO SUPPRESS OF DEFENDANT WALLACE

Defendant Wallace proposes several distinct theories for suppressing the evidence obtained against her at the Marshal's lock-up after her arrest. First, she argues that both the packet and statements must be suppressed as the fruits of an illegal arrest. Second, the exclusion of the packet is sought on the grounds that it was the product of a warrantless search. Finally, defendant suggests that the statements must be suppressed because she was not informed of her *Miranda* rights prior to questioning by Agent Meade. The government only meets the first two of these arguments. It asserts that there was probable cause to arrest Wallace, and that the search was incident to a valid arrest.

The court is persuaded that both the packet and statements must be suppressed due to the invalidity of Wallace's arrest. The court holds that the arrest occurred at about 11:25 a. m. on July 16 when agents, guns drawn, entered 27 Eugenia Street and "secured" the house. The evidence at the suppression hearing clearly showed that from that point on, the agents held Wallace captive in the house and would not have permitted her to leave had she tried. The parties have stipulated that the agents never obtained a warrant authorizing Wallace's arrest. In deciding whether such a warrantless arrest is valid, the court must determine whether the facts and circumstances known to the arresting agents were "suf-

ficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

As of 11:35 a. m., the only fact known to the agents relating to Wallace was that she was present in a house into which a quantity of heroin had been carried only moments before. The court, unlike the government, finds little significance in the fact that the defendant was discovered in the kitchen, near a stove, "readily available to cook heroin to prepare it for personal use." Government Memorandum, filed May 16, 1977, at p. 10. There is no evidence to indicate that the defendant knew the contraband was in the house, let alone that she exercised any dominion or control over it. Under the circumstances, this court concludes that there were insufficient facts for agents to believe that Wallace had committed or was committing an offense. *See United States v. Chadwick,* 532 F.2d 773 (1st Cir. 1976), *aff'd on other grounds,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

Because Wallace's arrest was invalid, both the packet and the statements must be suppressed as poisonous fruits.[8] *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### IV.

For all of the above-stated reasons it is hereby ORDERED that the motion to suppress of defendants Edwards, Richards and Zide is denied, and the motion to suppress of defendant Wallace is granted.

---

7. As an alternative ground for its holding, the court notes that the warrant to search 27 Eugenia Street may have been unnecessary. Once the Richards package was validly seized in Los Angeles, the government continued to exert dominion and control over the package until its arrival in Randolph by means of close, unbroken surveillance. *United States v. Ford,* 525 F.2d 1308 (10th Cir. 1975); *United States v. DeBerry,* 487 F.2d 448 (2nd Cir. 1973).

8. As a result of this holding, the court need not reach defendant Wallace's alternative theories for suppression. The court cannot resist noting, however, that there was no evidence introduced at the suppression hearing which would show that Wallace was informed as to her *Miranda* rights prior to questioning.