UNITED STATES of America, Appellee,

v.

Raymond EDWARDS, Appellant.

UNITED STATES of America, Appellee,

v.

David RICHARDS, Appellant.

Nos. 78–1242, 78–1243.

United States Court of Appeals, First Circuit.

Argued March 12, 1979.

Decided June 28, 1979.

As Amended July 25, 1979.

See also, D.C., 443 F.Supp. 192.

* Sitting by designation.

Ellen Yankiver Suni, Boston, Mass., with whom Jack I. Zalkind, Boston, Mass., by appointment of the Court, was on brief, for appellant Raymond Edwards.

Ronald J. Chisholm, Boston, Mass., by appointment of the Court, and Paul M. Hoffman, Boston, Mass., on brief, for appellant David Richards.

James F. X. Dinneen, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

PETTINE, District Judge.

Appellants were convicted of possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841, and conspiracy to commit the same crime, in violation of 21 U.S.C. § 846. Both Richards and Edwards challenge the admission into evidence at trial of the heroin seized in the course of the government's investigation and arrests. The questions we must resolve are: 1) whether the search of an air freight package by an airline employee constitutes government action, by virtue of pertinent federal statutes and regulations sufficient to invoke the protections of the Fourth Amendment and the exclusionary rule; 2) the constitutionality of the government's search of Edwards' residence, which led to

* Of the District of Rhode Island, sitting by designation.

the seizure of evidence against the defendants, premised on an allegedly invalid search warrant; and 3) whether the evidence against Edwards was sufficient for conviction on either count of the indictment.

The history of this case begins at the Los Angeles International Airport where, on July 16, 1976, an unidentified man approached the United Airlines shipping counter with a package. At the counter, he gave the package to United's Customer Service Agent (CSA) Robert Newlands, filled out a shipping slip, and paid a $42.00 fee. Pursuant to airlines regulations, Newlands asked the man to identify the contents of the package on the shipping slip. After some hesitation, he identified the contents as "film."

The man behaved suspiciously as he left the counter, stopping at several points within and without the terminal to observe the handling of his package. Newlands and his companion, CSA Morris, noticed the man's behavior; Morris feared that the package might contain "hazardous material," which was prohibited from shipment by Civil Aeronautics Board Tariffs, and decided to open it. Therein Morris found four bags of what later proved to be heroin. He informed his supervisor, who called the police.

Officer Celmer of the Los Angeles Police Department retrieved the opened package and brought it to a police substation at the airport. There, a field test verified the nature of the contents.

Because the package was addressed to David Richards in South Boston, Celmer contacted the FBI office in Boston. He was referred to the Drug Enforcement Agency (DEA) in Boston, whose Special Agent Richard O'Connor instructed Celmer to contact the FBI in Los Angeles. Celmer turned over to that agency eight of the ten ounces of heroin contained in the package. The FBI then executed a "controlled delivery" of the package to Logan Airport in Boston.

At about 10:40 A.M. on July 16, DEA agents observed David Richards pick up the package at Logan Airport. They followed him as he traveled by bus and car to the home of Raymond Edwards in Randolph, Massachusetts. As Richards' car pulled up to the curb in front of Edwards' house, Edwards met it and the two men removed the package from the trunk of the car, where Richards had placed it. At that point, Edwards gestured toward an FBI agent on surveillance from a nearby vantage point. The two men entered the house, Edwards carrying the package.

Shortly thereafter, the agents entered the house, without a search warrant, through a closed but unlocked door. One agent heard running water as he approached the door, and as they entered, the lead agent had his gun drawn. The agents found Richards, Edwards, and others in the kitchen. When the agents entered, Edwards voluntarily stated, "the package you are looking for is over there," indicating the pantry of the kitchen. Richards and Edwards were frisked, Edwards was handcuffed, and the agents then conducted a "body search" of the house to determine if other people were there.

For the next one and one half hours the agents secured the house but did not search for the package. During this time Edwards, after being informed of his rights, repeated his statement that the package was in the pantry. He claimed that he did not know the contents of the package and that Richards was the one who had brought it into the house.

The government agents waited while FBI agent Simpkins and an Assistant United States Attorney obtained a search warrant in Boston. Simpkins filed an affidavit in which he recounted the events of the case, including the developments in Randolph that morning. He identified Agent O'Connor (of the DEA in Boston) as the source of his information regarding events in Los Angeles; it was O'Connor, not Simpkins, who had spoken with Officer Celmers of the Los Angeles Police. The affidavit contained one inaccuracy: Simpkins mistakenly iden-

tified Celmers as the person who first opened the package, whereas United's CSA Morris, in fact, had opened the package first before summoning Celmers and delivered it to him without reclosing it.

A magistrate issued the search warrant. This information was radioed to the agents occupying Edwards' house, who then searched the premises and found the package in the pantry. It had been slit open.

After the arrests were made, Simpkins learned of his error and contacted Officer Celmers by telephone. On July 21, five days after the arrests, he filed an amended affidavit with correct facts as to the opening of the package. The magistrate noted on the amended affidavit that it was denied because the warrant already had been issued.

The district court denied defendants' motion to suppress, holding that the original search of the package by airline personnel was a private search not subject to the requirements of the Fourth Amendment. In addition, it found that the error contained in the original affidavit in support of the search warrant was made in good faith and not recklessly or negligently. Therefore, this defect did not require suppression of the fruits of the search authorized by the warrant. *See United States v. Edwards*, 443 F.Supp. 192 (D.Mass.1977).

Richards and Edwards subsequently were convicted and now bring this appeal.

I

Both appellants contend that the original opening of the Richards package constituted an illegal government search which was conducted without a warrant or probable cause. They argue that the fruits of that search—i.e. the heroin eventually brought to Edwards' house by Richards—should have been suppressed and not used as evidence against them. The validity of their argument is contingent upon a showing that there was sufficient government involvement in the search to bring into play the requirements of the Fourth Amendment.

■ The constitutional implications arising from the original opening of the package require an analysis of airline tariffs and regulations and the common law rights of airlines as common carriers. Edwards contends that the opening of the package by airline personnel constituted a government search because it was authorized by Rule 24 of the Official Air Freight Rules Tariff, C.A.B. No. 96. That tariff provides:

> Inspection of Shipments—All shipments are subject to inspection by the carrier, but the carrier shall not be obligated to perform such inspection.

Tariffs such as this are filed with the Civil Aeronautics Board pursuant to 49 U.S.C. § 1373(a),[1] which empowers the CAB to reject any tariff. A tariff so rejected is void. Conversely, tariffs which have been accepted by the Board are "conclusive and exclusive . . . [of] the rights and liabilities between airlines and their passengers," *Tishman & Lipp, Inc. v. Delta Air Lines*, 413 F.2d 1401, 1403 (2d Cir. 1969).[2] With regard to the tariff in question, Rule 24, its practical effect

> is that the person shipping goods consents to inspection of his goods by entering into the contract of shipment. The Board's involvement in these inspections—and

1. 49 U.S.C. § 1373(a) provides, in relevant part: Every air carrier and every foreign air carrier shall file with the Board, and print, and keep open to public inspection, tariffs showing . . . to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation. Tariffs shall be filed, posted, and published in such form and manner, and shall contain such information, as the Board shall by regulation prescribe; and the Board is empowered to reject any tariff so filed which is not consistent with this section and such regulations. Any tariff so rejected shall be void. . . . *See also* 14 C.F.R. Part 221, "Construction, Publication, Filing and Posting of Tariffs of Air Carriers and Foreign Air Carriers."

2. Courts gave reached this result either by treatment of the tariffs as a matter of law or as a binding contract between airlines and passengers. *See North American Phillips Corporation v. Emery Air Freight Corporation*, 579 F.2d 229, 233 (2d Cir. 1978), and cases cited therein.

therefore the Government's—is limited to accepting the tariffs as filed and providing a forum for challenges to the tariffs by either the Board or interested parties. *United States v. DeBerry*, 487 F.2d 448, 449–50 n. 1 (2d Cir. 1973).

Regardless of the effect of airline tariffs in general, and Rule 24 in particular, appellant's argument fails because Rule 24 is not the source of an airline's authority to search the freight it carries. The airline's inspection privilege

> is rooted in the rule of the common law that common carriers have the right to decline shipment of packages proffered in circumstances indicating contents of a suspicious, indeed of a possibly dangerous, nature. Justification for the carrier's refusal is to be found in the exigencies of safeguarding life and property, and undeniably the frustration of criminality is likewise a worthy carrier endeavor. The imperatives of either objective may warrant inquiry by the carrier as to the contents of a parcel tendered for shipment; they may suffice, too, to justify a reasonable inspection of the parcel to fulfill that purpose.
>
> *United States v. Pryba*, 163 U.S.App.D.C. 389, 502 F.2d 391, 399 (1973) (footnotes omitted).

*See also United States v. Crabtree*, 545 F.2d 884 (4th Cir. 1976); *United States v. Ford*, 525 F.2d 1308 (10th Cir. 1975); *United States v. Issod*, 508 F.2d 990 (7th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975); *United States v. DeBerry, supra; United States v. Blanton*, 479 F.2d 327 (5th Cir. 1973); *United States v. Echols*, 477 F.2d 37 (8th Cir.), *cert. denied* 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973).

Rule 24 explicitly states that "the carrier shall not be obligated" to perform any inspection. Thus, whether the tariff is given the force and effect of law or of a contract between the parties,[3] it added nothing to CSA Morris' authority when he decided to open Richards' package. *United States v. Crabtree, supra; United States v. DeBerry, supra*. The CAB merely accepted a tariff which did not expand upon or require the exercise of Morris' common law right to conduct the search. We cannot say that this action sufficiently involved the government in Morris' search to warrant application of the Fourth Amendment in these circumstances. *Cf. Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 378 (1974) (utility's tariff filed with state agency insufficient to create state action).

In No. 78–1243, appellant Richards asserts the applicability of the Fourth Amendment on a different basis. He argues that Section 204 of the Air Transportation Security Act of 1974, Pub.L.No. 93–366, Title II, 88 Stat. 415 (codified at 49 U.S.C. § 1511 *et seq.*) (1976), and accompanying regulations, *see* 14 C.F.R. § 121.538, confer a government function on the airlines sufficient to subject them to the requirements of the Fourth Amendment.

Richards relies on *United States v. Fannon*, 556 F.2d 961 (9th Cir. 1977), wherein the Court of Appeals for the Ninth Circuit held that the search of an air freight package by an airline employee does constitute government action for Fourth Amendment purposes by virtue of Section 204 of the Act. The court took the view that the statute confers a government function on airline employees as part of the government's air transportation security program, and that Congress thereby "supplanted whatever common law power of search air carriers may have had and subjected such searches to the Fourth Amendment's standard of reasonableness." *Id.* at 965 (citations omitted).

The *Fannon* decision was against the clear weight of authority on the issue of application of the Fourth Amendment to air freight searches by airline employees.[4] However, while several courts have discussed CAB tariffs as a possible source of government involvement in air freight

---

3. *Id.*

4. *See* cases cited at p. 463, *supra*.

searches for Fourth Amendment purposes, *see United States v. Crabtree, supra; United States v. DeBerry, supra, Fannon* is unique in its reliance on Section 204 of the Air Transportation Security Act as a source of government involvement in air freight searches.

We would be impressed by Richards' claim if not for the recent rehearing *en banc* and reversal of *Fannon sub nom. United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979). In *Gumerlock*, the Ninth Circuit undertook a close analysis of the Air Transportation Security Act of 1974 and accompanying regulations, together with the legislative history of the Act and the administrative background of the regulations. *See also United States v. Davis*, 482 F.2d 893 (9th Cir. 1973) (wherein the Ninth Circuit reviewed the background of the government's airport security program). We agree with the court below, which respectfully declined to follow *Fannon*, and with the Ninth Circuit's well-documented analysis in *Gumerlock*, that Section 204 of the Act, 49 U.S.C. § 1511, and its accompanying regulation, 14 C.F.R. § 121.538, do not require security screening or searches of parcels shipped in air freight by persons who are not passengers. *See United States v. Edwards, supra*, 443 F.Supp. 198–199; *United States v. Gumerlock, supra*, 590 F.2d 795–800.

Thus, we conclude that CSA Morris' search of Richards' package was rooted in the common law right of all carriers to inspect and refuse shipment of parcels of a suspicious, possibly dangerous, nature, *United States v. Pryba, supra*, 502 F.2d at 399, and that his search of the package was neither authorized nor compelled by CAB Tariff No. 96 (Rule 24); Section 204 of the Air Transportation Security Act, 49 U.S.C. § 1511; or 14 C.F.R. § 121.538. Therefore, appellants have not shown sufficient government involvement to warrant application of the Fourth Amendment to Morris' actions.

## II

Both appellants argue that the Richards' package should have been suppressed because of a defect in the affidavit supporting the warrant which authorized the search of Edwards' home. The defect, to which we have alluded,[5] involved FBI Agent Simpkins' misstatement that it was Officer Celmers of the Los Angeles Police Department who first opened the package. As we already have pointed out, this was not true, because CSA Morris of United Airlines had opened the package before the police were summoned. Celmers arrived at the office of Morris' supervisor to find the package already opened.

Agent Simpkins, the affiant, had no personal knowledge of these events; before the warrant was issued, only Agent O'Connor of the Boston DEA had spoken to Celmers by telephone. On July 21, 1976, five days after the warrant was issued and the arrests and seizure were made, Simpkins filed an "Amended Affidavit" in which he stated that he first spoke with Celmers on July 19, when he learned that Morris, rather than Celmers, had opened the package.

It is appellant Richards' contention that this misstatement in Simpkins' affidavit undermines the validity of the search warrant, thereby requiring the exclusion of the package as the fruit of an illegal search. In *United States v. Belcufine*, 508 F.2d 58 (1st Cir. 1974), we recognized

> a slow thaw in the rigidity of the rule which had long predominated among the circuit courts that judicial scrutiny of the propriety of the issuance of a warrant could not probe beneath the surface of the supporting affidavits. *Id.* at 60 (footnotes omitted).

At that time we noted that a "process of reassessment" had culminated in "the adoption of general standards which permit examination of the accuracy of affidavits underlying a warrant in a variety of circumstances." *Id. See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and cases cited at n.4.

---

5. *See* discussion at pp. 461–462, *supra*.

While we refused to adopt a general standard for this circuit on the facts of *Belcufine*, we suppressed evidence in that case "obtained pursuant to a warrant based on an affidavit containing an intentional, relevant, and non-trivial misstatement." *Id.* at 63. We have reaffirmed our approach in *Belcufine* on at least one occasion. *United States v. Cruz Pagan*, 537 F.2d 554, 557 (1st Cir. 1976).

While the district court applied our holding in *Belcufine* to the present case, we undertake our review with the benefit of intervening guidance from the United States Supreme Court. In *Franks v. Delaware, supra,* the Supreme Court set forth a succinct rule to be applied to warrant challenges based on allegedly inaccurate affidavits:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–156, 98 S.Ct. at 2676–77.

The court below found that Agent Simpkins' misstatement was made in good faith and was intended neither to "deceive the magistrate [nor] to pad an otherwise inadequate affidavit." *United States v. Edwards, supra,* 443 F.Supp. at 196 (footnotes omitted). We affirm that finding; appellants have not cited any evidence which would tend to prove perjury or recklessness on the part of Simpkins.

The lower court also held that Simpkins was not negligent in his failure to cross-check the information he received from O'Connor. Under the rule set forth in *Franks* we need not consider whether an affiant's misstatement was negligent if it was neither intentional nor in reckless disregard for the truth. *Id.* at 170, 171, 98 S.Ct. 2674. Even if his failure to cross-check the information given to him by O'Connor was careless, appellant has demonstrated no reason for Simpkins to have suspected that the information was in error. His reliance on information supplied by a fellow agent, albeit in error in this instance, was not so unwarranted as to undermine the validity of the search warrant under the standard of *Franks.*

We note, in addition, that the misstatement does not rise to the level of materiality defined in *Franks*, 438 U.S. at 132, 98 S.Ct. 2674, and in our own opinion in *Belcufine*, 508 F.2d at 62. The Supreme Court held that exclusion would be required only if "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause . . . ." *Franks, supra,* at 156, 98 S.Ct. at 2677. We undertook the same approach to materiality in *Belcufine, supra,* at 62, and the lower court applied this rule to find that Simpkins' misstatement was not material, although it did find the misstatement non-trivial. *United States v. Edwards, supra,* 443 F.Supp. at 200. We concur with the lower court's finding on this issue; the facts made known to the magistrate on the morning of July 16, exclusive of Simpkins' statement regarding Officer Celmers, amply supported his finding of probable cause to search Edwards' home.

We conclude that, under our own precedent and the rule set forth by the Supreme Court in *Franks*, this challenge to the validity of the search warrant is without merit.

■ Appellant Edwards takes a different tack in his challenge to the validity of the warrant. Focusing on the substance of the misstatement, Edwards contends that the original Simpkins' affidavit described a constitutionally impermissible search on its

face because it revealed that Officer Celmers opened the package without a warrant. Edwards would have us reverse based on the magistrate's failure to address this constitutional violation and to deny the warrant on that basis.

Of course, this is not a case in which the alleged illegality shown on the face of the affidavit actually occurred; Simpkins' statement as to Celmer's action without a warrant was not true because Celmers did not perform the initial search. Thus Edwards' argument for suppression based on Simpkins' misstatement does not involve evidence obtained as the "fruit of the poisonous tree." Such considerations are irrelevant here because we have found no illegality in fact in connection with the opening of the package. .

Edwards' position would require us to impose upon magistrates the obligation to consider the legality of the information before them in conjunction with their probable cause determination. The lower court's response to this contention was that it

> misconstrues the function of magistrates in issuing search warrants. His function is to determine whether the government has presented sufficient evidence to establish probable cause for the issuance of a warrant. His job is not to decide whether the evidence was obtained by constitutional means. Such decisions are reserved for trial courts at motions to suppress. *United States v. Edwards, supra,* 443 F.Supp. at 197.

We do not agree with Edwards that the original affidavit contained a clear indication of a constitutional violation. While

there is no indication in the affidavit containing the misstatement that Celmers did obtain a warrant, the magistrate would have had to presume the non-existence of exigent circumstances or other factors justifying search without a warrant before he could have concluded that a constitutional violation had occurred.

Moreover, we are not prepared to impose on magistrates the duty or responsibility to rule on the legality of sources of information for the purpose of denying a search warrant. Such a decision would preempt a motion to suppress, which is traditionally brought before a judge. Moreover, the Federal Magistrates Act, 28 U.S.C. § 638, specifically provides that magistrates may not "hear and determine . . . [motions] to suppress evidence in a criminal case." 28 U.S.C. § 636(b)(1)(A). While § 636(a)(1) confers upon magistrates "all powers and duties conferred or imposed . . . by the [Federal] Rules of Criminal Procedure," we find no authority in the Rules which would support a magistrate's determination of a suppression issue.[6] Section 636(b)(1)(B) does authorize judges to designate magistrates to conduct hearings and file proposed findings of fact and recommendations for disposition of motions to suppress, but the parties may file written objections to the proposed findings and the court is to make *de novo* determinations on findings to which objections are made.[7] *See Campbell v. United States District Court for the Northern District of California,* 501 F.2d 196, 205 (9th Cir.), *cert. denied,* 419 U.S. 1071, 95 S.Ct. 143, 42 L.Ed.2d

---

**6.** While Fed.R.Crim.P. 41(c)(1) provides for the issuance of warrants by a magistrate based upon his determination of probable cause, and authorizes him to "require the affiant to appear personally" and to "examine under oath the affiant and any witnesses he may produce," subparagraph (f) of the same rule requires that motions to suppress be made "in the court of the district of trial" according to Rule 12. Rule 12(e) provides for rulings on motions to suppress and requires that "(w)here factual issues are involved in determining a motion, the court shall state its essential findings on the record." Finally, Rule 5.1(a) states that "[o]bjections to evidence on the ground that it was acquired by unlawful means are not properly made at the preliminary examination. Motions to suppress

must be made to the trial court as provided in Rule 12."

**7.** Despite this statutory authorization, one appellate court has found a denial of due process where a trial judge declined to rehear witnesses when it undertook *de novo* review of a magistrate's findings on a motion to suppress. Because the credibility of the witnesses was "determinative," the trial court's decision to undertake *de novo* review only on the basis of a written record was held a denial of due process despite the fulfillment of Article III requirements. *United States v. Raddatz,* 592 F.2d 976 (7th Cir. 1979).

119 (1974) (upholding a local rule authorizing magistrates to make proposed findings and recommendations on motions to suppress). Thus, accepting Edwards' position, i. e. that magistrates should be authorized to make determinative rulings where clear constitutional errors appear on the face of affidavits, would be an impermissible expansion of the magistrate's power.[8] *See Giordenello v. United States,* 357 U.S. 480, 484, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1954).

Edwards refers us to our decision in *Rosencranz v. United States,* 356 F.2d 310 (1st Cir. 1966), wherein we stated that "the function of the warrant-issuing magistrate would wither away to the point of being a vestigial formality" if an issue which could be decided by a magistrate were deferred to a later motion to suppress hearing before a judge. *Id.* at 317. However, Edwards ignores the fact that the issue which was deferred in *Rosencranz* was precisely the issue which is within the power of the magistrate to determine—the existence of probable cause. *Id.* Here, Edwards would have us facilitate speedy resolution of Fourth Amendment issues by an improper expansion of that power. We decline to do so, and we hold that the magistrate's failure to address the legality of sources of information on the basis of the July 16 Simpkins' affidavit did not invalidate the search warrant here.

### III

Appellant Richards presents one more argument in favor of suppression of his package. It is that the initial entry into Edwards' home was not authorized by a warrant nor accompanied by exigent circumstances justifying the government's failure to obtain a warrant. Therefore, he contends, the subsequent seizure of the package was illegal.

It is true, of course, that the initial entry into Edwards' home was made without a warrant, and that the government agents exercised complete control over the premises and everyone inside the house. They entered unannounced and with guns drawn, frisked Richards and Edwards, and held all the occupants of the house in the kitchen while the warrant was obtained. As the lower court noted, the agents "acknowledged that they would not have permitted anyone to leave the premises." *United States v. Edwards, supra,* 443 F.Supp. at 195.

The lower court did not address the legality of the government agents' entry into Edwards' home, focusing instead on a distinction between the entry and the subsequent search which uncovered the package. Because the agents did not conduct that search until after the valid search warrant was obtained, the court held that the package was "seized as the fruit of the warrant, and was untainted by the alleged illegality of the entry." *United States v. Edwards, supra,* 443 F.Supp. at 200 (citations omitted).[9] We reject Richards' argu-

---

**8.** It also may be argued that permitting magistrates to make such determinative rulings would be constitutionally impermissible under Article III. *See generally,* Comment, Masters and Magistrates in the Federal Courts, 88 Harv. L.Rev. 779, 780–81 (1975). Most of the discussion of this issue has taken place in the context of civil cases referred to magistrates. *See, e. g., DeCosta v. Columbia Broadcasting System, Inc.,* 520 F.2d 499 (1st Cir. 1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976) (referral of a copyright claim by consent of the parties); *Cruz v. Hauck,* 515 F.2d 322 (5th Cir. 1975) (inmates' civil rights actions). *See also Campbell, supra* (motions to suppress in criminal cases). The Supreme Court expressly has declined to address this constitu-

tional issue. *Mathews v. Weber,* 423 U.S. 261, 269 n. 5, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976), and cases cited therein.

**9.** In a footnote, the lower court indicated an alternative ground for its holding, that because "the government continued to exercise dominion and control over the package until its arrival in Randolph by means of close, unbroken surveillance," a warrant may not have been necessary. *United States v. Edwards, supra,* at 201 n. 7. However, the court relied on *United States v. Ford,* 525 F.2d 1308 (10th Cir. 1975) and *United States v. DeBerry, supra,* both cases in which government seizures took place immediately after defendants obtained packages pursuant to a "controlled delivery." The

ment on a different basis, and we hold that the agents' entry into Edwards' home was justified by the existence of exigent circumstances.

■ While warrantless entries into a person's home are *per se* unreasonable, *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), they may be justified where sufficient exigent circumstances exist.[10] *Vale v. Louisiana,* 399 U.S. 30, 34–35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *McDonald v. United States,* 335 U.S. 451, 454–5, 69 S.Ct. 191, 93 L.Ed. 153 (1948). In *United States v. Picariello,* 568 F.2d 222 (1st Cir. 1978), for example, we recognized that a warrantless entry into and the securing of a defendant's home, pending the issuance of a search warrant, was justified where it was feared that the defendant, who remained at large at the time of the entry, might return to his apartment to retrieve dynamite for use in the next of a series of bombings of which he was suspected. The government's desire to prevent that occurrence, together with its inability to obtain a warrant in time, was held sufficiently compelling to justify the agents' entry. *Id.* at 226.

More specifically, the possibility that evidence will be destroyed by defendants who have discovered government surveillance of their activities often has been recognized as a sufficient exigency to justify warrantless entry. *See, e. g., United States v. Flickinger,* 573 F.2d 1349 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Gardner,* 553 F.2d 946 (5th Cir. 1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978); *United States v. Grummel,* 542 F.2d 789 (9th Cir. 1976), *cert. denied,* 429 U.S. 1051, 97 S.Ct. 763, 50 L.Ed.2d 767 (1977); *United States v. McLaughlin,* 525 F.2d 517 (9th Cir. 1975), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1977); *United States v. Rubin,* 474 F.2d 262 (3rd Cir. 1973), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *United States v. Bustamente-Gomez,* 488 F.2d 4 (9th Cir. 1973). *See also United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In *United States v. Flickinger, supra,* for example, government agents had arrested defendant's confederates about three hours before they entered his home without a warrant. The Court held that

> [i]t would not be unreasonable for the DEA officers to fear that a warning telephone call would come to the [defendant's] home from [defendant's confederates] or from someone they would contact. . . . In addition, . . . the agents could reasonably [have] believe[d] that . . . a concerned prospective recipient [of the drugs to be delivered by defendant's arrested confederates] might alert [defendant] that the delivery was overdue and thus had possibly been intercepted. *Id.* at 1356.

During Richards' and Edwards' brief conversation in front of Edwards' home, "Edwards gestured toward FBI Agent Murphy, who was at a nearby surveillance post, causing Murphy to worry that Edwards, with whom he was acquainted, had recognized him." *United States v. Edwards, supra,* 443 F.Supp. at 195. The government agents could not have obtained a search warrant for Edwards' home prior to their arrival there, because they did not know where Richards was going before he stopped in front of Edwards' home.

---

facts in the present case distinguish it from *Ford* and *DeBerry*—here, the package was in Richards' possession for an hour, during which he was beyond the immediate physical reach or control of government agents who followed him to Edwards' home. We think the government could not have exercised "dominion and control" over the package during that time, and that, therefore, their retrieval of the package at Edwards' home constituted a new seizure for Fourth Amendment purposes distinct from the government's taking of the package in Los Angeles.

10. The propriety of a warrantless entry into a home to effectuate an arrest based upon probable cause but not accompanied by exigent circumstances is an unresolved issue currently before the Supreme Court. *Payton v. New York,* No. 78–5420, rearguments ordered 4/30/79, 25 Cr.L. 4039 (5/2/79).

■■ These facts support our conclusion [11] that the government agents legitimately could fear that Richards and Edwards had discovered their surveillance and would destroy the package before a search could be obtained. Therefore, their entry into Edwards' home was justified in order to prevent the destruction of that evidence, and no illegality existed to taint the search warrant subsequently obtained.[12]

11. We recognize that the lower court did not make a finding of exigent circumstances. However, it did note the effect of Richards' and Edwards' discussion in front of Edwards' house and the gesture toward Agent Murphy. Thus, although the issue was not focused upon by the trial court, we find our own conclusion that exigent circumstances existed supported by that court's specific factual finding. *See United States v. Miller*, 589 F.2d 1117, 1127 (1st Cir. 1978) (relying "on the record and the few facts found" to address legal argument on a suppression issue which was not emphasized before the lower court).

Our finding of exigent circumstances is supported by testimony in the record of the jury trial below. Government agents testified to Richards' erratic driving between Logan Airport and Edwards' home, as if to elude vehicles that were following him. One agent stated that Richards turned almost completely around on more than one occasion to observe the car behind him, in which the agents were following.

Finally, we find irrelevant the lower court's finding that one of the agents heard the sound of running water as he approached the door of Edwards' home. *United States v. Edwards, supra*, 443 F.Supp. at 195. Even if that observation did suggest that an attempt at destruction of the evidence was being made within, the government admitted in oral argument that this occurred after the agents began their entry and were on the porch of Edwards' house.

12. As we have noted, the lower court refrained from finding exigent circumstances, relying instead on its finding that the seizure was factually and causally independent from the initial entry. While appellant Richards would have us reverse this holding, we decline to do so.

Richards' first argument on this point is that the seizure of the package took place, for the purpose of applying the Fourth Amendment, at the time of the initial entry. He relies on our holdings in *United States v. Berrett*, 513 F.2d 154 (1st Cir. 1975) and *United States v. Berkowitz*, 429 F.2d 921 (1st Cir. 1970). In these cases we recognize that the exercise of dominion, especially where agents secure the premises and physically restrain the occupants, *United States v. Berkowitz, supra*, 429 F.2d at 925, and display weapons, *United States v. Berrett, supra*, 513 F.2d at 155, may transform a mere entry into the premises into an effective seizure of articles therein for Fourth Amendment purposes. However, in *Berkowitz, supra* and *Berrett, supra*, the articles in question were in plain view of the government agents as they entered the defendants' premises; discovery of those articles unavoidably was the direct result of the initial entries. Here, although the agents did exercise complete control over the occupants of Edwards' home, their discovery of Richards' package required an additional affirmative step on their part. They entered for the sole purpose of securing the premises and did not conduct the necessary search until it was authorized by a valid search warrant. Therefore, the government's exercise of dominion, without more, cannot be identified factually with the seizure of the package.

Apart from any alleged factual identity between the entry and the seizure, Richards also argues that seizure of the package was tainted by the alleged illegality of the entry as the "fruit of the poisonous tree." Although "[t]he exclusionary prohibition extends as well to the indirect as the direct products of the [illegal] invasions," *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *see also Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Company v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), such an extension of the rule usually turns upon whether government agents have discovered evidence or included in affidavits supporting subsequent search warrants "facts which were actually discovered by a unlawful act." *United States v. Paroutain*, 299 F.2d 486, 489 (2nd Cir. 1962). *See, e.g., United States v. Clark*, 531 F.2d 928 (8th Cir. 1976). Conversely, where a prior illegality fails to produce information which could have been relied upon to conduct a subsequent search, *see, e. g., United States v. Worthington*, 544 F.2d 1275 (5th Cir.), *cert. denied*, 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977), or produces information which is unnecessary to legitimize a subsequent search, *see, e.g. United States v. Race*, 529 F.2d 12 (1st Cir. 1976), exclusion of the discovered evidence is not required. This is true even if the prior illegality may be characterized as a "but for" element in the causal chain leading to discovery of the evidence in question. *See, e.g., United States v. Sor-Lokken*, 557 F.2d 755 (10th Cir.), *cert. denied*, 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 181 (1977); *United States v. Walker*, 535 F.2d 896 (5th Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976).

In the present case, the government's search warrant was not based on information gained subsequent to the agents' entry into Edwards' home; there is no indication in the record that agents at Edwards' home communicated with Agent Simpkins, who obtained the warrant

## IV

[11] Finally, appellant Edwards contends that the evidence against him was insufficient for conviction on either count of the indictment. In review of this claim, we must view the evidence in the light most favorable to the government, "together with all legitimate inferences to be drawn therefrom." *United States v. Doran,* 483 F.2d 369, 372 (1st Cir. 1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974); *United States v. Gabriner,* 571 F.2d 48 (1st Cir. 1978). Our object is to inquire "whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that the defendant is guilty beyond a reasonable doubt." *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964). *See also United States v. Francomano,* 554 F.2d 483, 486 (1st Cir. 1977); *United States v. Conception Cueto,* 515 F.2d 160, 162 (1st Cir. 1975).

 In order to prove possession of heroin under count one of the indictment, the government was required to show Edwards' actual or constructive possession, *United States v. Staten,* 581 F.2d 878 (D.C. Cir.1978), and awareness of the nature of the substance he possessed. *United States v. Pope,* 561 F.2d 663 (6th Cir. 1977). Here, Edwards assisted Richards in removing the package from the trunk of Edwards' own car, which Richards had borrowed. Edwards carried the package into his house. When DEA agents informed him that they were waiting for a search warrant and that they would search for heroin after they received the warrant, Edwards voluntarily stated, "The package you are looking for is over there," and nodded toward the pantry off the kitchen. When the agents discovered the package, it had been slit open.

We disagree with Edwards' assertion that this evidence "[is] perfectly consistent with ignorance of any drug . . . scheme." *United States v. Francomano, supra,* at 487. Edwards did assert a possessory interest in the package by carrying it into his own home. *Compare United States v. Chadwick,* 532 F.2d 773 (1st Cir. 1976), *aff'd on other grounds,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). His twice-repeated statement regarding the package they were looking for, and the fact that the package had been opened almost immediately upon Richards' and Edwards' entry into the house, support a finding of his knowing possession beyond a reasonable doubt. *United States v. Conception Cueto, supra; United States v. Gabriner, supra.*

 With respect to intent to distribute as an element of count one, "[i]t is well-established, that intent to distribute may in proper circumstances be inferred from the amount seized." *United States v. Ramirez Rodriguez,* 552 F.2d 883 (9th Cir. 1977). Despite appellant's contention that no clear evidence as to the amount of drugs seized was presented to the jury, the government points out that exhibits entered by stipulation at trial consisted of one bag from the package containing 165.49 grams of heroin and another exhibit containing the quantity which was left in the package seized in Edwards' house, 7.53 grams. In addition, the Simpkins' affidavit, upon which the search warrant was granted and which was read to the jury, stated that the original package deposited at the United Airlines counter in Los Angeles contained 10 ounces (about 284 grams) of heroin. We do not believe that this evidence was insufficient to support the inference of intent to distribute.

 Edwards also challenges his conviction of conspiracy to possess heroin with intent to distribute under count two of the

---

from a magistrate in Boston, between the time of the entry and the time the warrant was issued. Even if it may be said that Edwards' statement regarding the whereabouts of the package was the direct result of the entry and that it later facilitated the agents' search, it did not facilitate the obtaining of the search war-

rant. The agents surely would have discovered the package—it was in a closet of the pantry—in the conduct of their search, the authority for which was not "come at by exploitation" of Edwards' statement. *Wong Sun, supra,* at 488, 60 S.Ct. 266.

indictment. We believe that there was sufficient evidence to support this conviction. Edwards' car was used by Richards to make his initial pickup in Boston, and his home was used as the first storage point of the heroin. Edwards immediately met Richards as he drove up to the curb in front of Edwards' house, took possession of the package, and brought it into his house. We believe that these facts would support a jury's conclusion that Edwards "knew of and participated in a conspiratorial agreement" to possess and distribute the heroin. *United States v. Cornish,* 491 F.2d 80, 81 (1st Cir. 1974) (*per curiam*).

*Judgment is affirmed.*