UNITED STATES of America,
Plaintiff,

v.

Carlos TORRES, Defendant.

No. C.R. 03–038S.

United States District Court,
D. Rhode Island.

July 23, 2003.

Adi Goldstein, Esq., Kenneth P. Madden, Esq., U.S. Attorney's Office, Providence, RI, for Plaintiff.

Olin W. Thompson, Esq., Federal Defender's Office, Providence, RI, for Defendant.

## MEMORANDUM AND ORDER

SMITH, District Judge.

Before the Court for decision is Defendant Carlos Torres' ("Defendant" or "Torres") Motion to Suppress all evidence acquired as a result of a search of the Defendant's home on April 26, 2003, as well as the interrogation of the Defendant which took place in connection with the search. Pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

On or about April 26, 2003, Drug Enforcement Agency ("DEA" or "Government") Agents in Providence, Rhode Island, received information from a confidential source that the Defendant would be obtaining one kilogram of cocaine from New York City. The source indicated that another individual known as "Ricky" would be acquiring some of the cocaine from the Defendant.

DEA Agent Robyn Morrissey ("Morrissey" or "Agent Morrissey") was in charge of the investigation and was working directly with the confidential source, whom she identified as CS1. CS1 informed Agent Morrissey that the Defendant resided at 232 Lowell Avenue in Providence, Rhode Island. Agent Morrissey independently confirmed that the Defendant lived at 232 Lowell Avenue. CS1 also informed Agent Morrissey that the Defendant was driving a brown Buick Century automobile and that the other individual, Ricky, was a known drug dealer in Providence and that

he drove a blue Mercury Sable automobile, possibly a 1994 model. According to Morrissey's testimony, CS1 had been signed up as a confidential source for the DEA since August 2002. CS1 had provided information to the DEA in Rhode Island and New York, and was considered a reliable source. He had not been known to provide false information. However, none of the information provided by CS1 had yet resulted in any convictions.

After receiving the information from CS1 regarding the Defendant, Agent Morrissey made contact with another confidential source, CS2, and obtained information which corroborated some of the information provided by CS1. CS2 confirmed that the individual known as Ricky was in fact Eduardo Lopez ("Lopez"), and that Lopez drove a blue Sable, either a 1992 or 1994 model. CS2 also confirmed that Lopez was a well known drug dealer in Providence.

On April 26, 2003, Agent Morrissey received a call from CS1 at approximately 7 a.m. CS1 informed Agent Morrissey that the Defendant had returned from his trip to New York with the cocaine. The Defendant had called CS1 and asked him to go to Home Depot with him to gather some materials, presumably to assist in the "cutting" or hiding of the cocaine.

Agent Morrissey immediately went to the Providence headquarters of the DEA and began to assemble a team for a surveillance operation. DEA Agents Griffen, Leighton, Gianelli and Task Force Agents Stravata and Plasse, as well as members of the Providence Police Department, were assembled to conduct the surveillance operation. Surveillance was established at approximately 9:30 a.m. at 232 Lowell Avenue. Agent Leighton arrived first, with Morrissey arriving a short time thereafter. The Defendant's vehicle, a brown Buick Century, was observed in the parking lot across the street from 232 Lowell. Agent Morrissey placed a call to CS1 while en route to 232 Lowell Avenue and asked CS1 if he had observed the cocaine inside the residence. CS1 replied affirmatively, and that the cocaine was located inside the refrigerator in the kitchen. CS1 indicated that he had observed one kilogram of cocaine. Agent Morrissey testified that the wholesale value of one kilogram of cocaine is approximately $21,000 to $26,000. The retail value of this cocaine, assuming it was "cut," could reach as much as $60,000.

When Morrissey arrived at 232 Lowell she placed a call to CS2 to see if Lopez was still driving a blue Sable automobile. CS2 indicated that Lopez indeed was driving a blue Sable and that CS2 was looking at the car at that moment. Agent Morrissey told CS2 to remain on the phone while she drove over to Lopez's residence on Hartford Avenue, which was around the corner from 232 Lowell. When Morrissey arrived at Lopez's Hartford Avenue address, 488 Hartford Avenue, CS2 was across the street pointing to the residence and to the blue Sable vehicle owned by Lopez. Morrissey then established surveillance at 488 Hartford Avenue in order to observe Lopez's residence and vehicle.

At 10:45 a.m. Agent Morrissey again contacted CS1 to inquire whether CS1 and the Defendant had begun cutting the cocaine. CS1 said "yes," and abruptly hung up. CS1 contacted Agent Morrissey again at 11:35 a.m. to say that he/she was leaving 232 Lowell because it was taking too long to cut the cocaine.

Just before noon, Agent Morrissey heard by radio that the Defendant was leaving 232 Lowell. The Defendant left his residence and drove his brown Buick Century to Lopez's address at 488 Hartford Avenue.

Agent Morrissey had established surveillance at 488 Hartford Avenue. Her fellow Agent radioed that Defendant Torres was headed toward Hartford Avenue in the brown Buick Century. Agent Morrissey then began to pull out of the parking lot in which she was parked. As she was pulling out, she observed Lopez standing outside of his residence next to his blue Sable automobile. She observed the Defendant drive up in the Buick, and the trunk of the Sable opened. She also observed, as she was driving by, the Defendant hand Lopez a white object, which Agent Morrissey characterized either as a "white bag" or "something white inside a bag." Lopez appeared to place the white object in the trunk of his car. Morrissey testified that she believed Lopez and the Defendant spent approximately five minutes at their parked cars.

Thereafter, Lopez was observed by Agents leaving Hartford Avenue and traveling to 232 Lowell, and arriving about 12:27 p.m. Approximately twenty minutes later, Lopez was observed leaving 232 Lowell heading toward Hartford Avenue on Lowell.

Lowell Avenue is a short street, residential in nature. While the testimony was somewhat unclear on this point, the distance between the Defendant's address at 232 Lowell and Lopez's address at 488 Hartford Avenue is very short. Morrissey indicated that the drive from 232 Lowell to 488 Hartford Avenue was less than a minute and was approximately half-a-block and right around the corner. While Lowell is a quiet, residential street, Hartford Avenue is a major thoroughfare and quite busy. On the way to Hartford Avenue, within thirty seconds of leaving 232 Lowell, Lopez was stopped by DEA Agents. Agents Griffen, Stravata, Leighton, Gianelli, and Morrissey all participated in the vehicle stop. Four cars were involved in

the stop. The cars were unmarked, but equipped with flashing lights and sirens, both of which were used in the apprehension of Lopez. Agent Morrissey testified that the decision to pull over and apprehend Lopez at this location was based on her concern that Agents might lose him if he made it to Hartford Avenue and because she felt that it would be safer to conduct the stop on a residential street, as opposed to a major thoroughfare.

There was no testimony to indicate whether 232 Lowell remained under surveillance during the vehicle stop and arrest of Lopez on Lowell Avenue. While the Court might surmise that other Agents were keeping 232 Lowell under surveillance during this time (Morrissey's testimony indicates that at least Agent Plasse as well as members of the Providence Police Department were somewhere other than engaged in the vehicle stop and arrest of Lopez) the record is simply unclear on this point. What is clear, however, is that the location of the stop and arrest of Lopez was approximately nine houses away from 232 Lowell, and possibly (though not certainly, as will be discussed below) within sight of the house.

At the time of Lopez's arrest, it is undisputed that the Defendant was still inside the residence at 232 Lowell. During the questioning and arrest of Lopez (which was made after Agents observed cocaine protruding from Lopez's pants pocket), Agent Morrissey determined that Agents should return to the Defendant's residence and conduct a "knock and talk." Morrissey testified that she believed at this time that she had probable cause to search Defendant's residence. She indicated that she was concerned that the Defendant may have observed the stop and arrest of Lopez. Specifically, Agent Morrissey testified as follows:

At that time I didn't know when Mr. Torres—when Mr. Torres or if Mr. Torres would leave that residence and I sat there weighing my options on what to do. I felt it was best to do a knock and talk and see if what Mr. Torres would like to speak to us about.

Transcript, July 1, 2003, p. 26. When asked to describe what she meant by a "knock and talk," Morrissey stated as follows:

> Generally you only have just maybe two members come with you to the front door and you knock on the door and what I wanted to do at that time was say, introduce myself and say we had information that there was cocaine inside of the residence, would you like to talk to us about it and then the conversation goes from there. If Mr. Torres said no, then we go on. *At that point, I believed we had probable cause to believe that there was at least a half kilogram of cocaine in the residence and the house would be secured.*

*Id.* (emphasis added). When asked why she made the decision to proceed immediately to the Defendant's house following the stop of Lopez, Morrissey testified as follows:

> I had a concern that there was a possibility that maybe Mr. Torres could see the vehicle stop that was conducted right down the road or somebody could have telephoned him indicating that there was a stop of somebody there coming from his house. A lot of times in those neighborhoods, the neighbors know each other and they look out for one another.

*Id.* at 27–28.

In spite of this concern, Agent Morrissey did not include any mention of the possibility of discovery or fear for the destruction of evidence in her written report. Moreover, on cross-examination Morrissey made clear that her intention was to enter the house at least to conduct a security sweep "of the evidence" when she made the decision to conduct a "knock and talk." She clearly believed that this was an option available to her because after the arrest of Lopez she had established probable cause. The following exchange demonstrates Agent Morrissey's thinking at the time she made the decision to conduct the knock and talk.

Q. So at the time that you went and did this knock and talk, it was already predetermined that if Mr. Torres refused to let you into the house, agents would have gone into the house and conducted a protective sweep?

A. Correct, because at the time that the information was corroborated and I had probable cause, it was, I had minutes to decide, it was a decision that I made based on an option I believed I had at the time.

Q. So it wasn't a knock and talk because you already knew you were going into the house, correct?

MS. GOLDSTEIN: Objection.

THE COURT: Overruled.

A. My intention was to talk to Mr. Torres. If he did not want to speak to me, I would have gone to attempt to obtain a warrant at that time.

Q. Would you have gone to obtain a warrant or would you have gone into the house?

A. I would not have done an invasive search of the residence, I would have conducted a security sweep of the evidence to maintain the—

Q. So Mr. Torres never had a choice whether to let you into the house or not?

A. Mr. Torres had a choice to voluntarily let me in, continue going in with him or he could have said no.

Q. And if he had said no you would have gone in?

A. To do a security sweep, not a search.

*Id.* at 128–129.

Morrissey and two other Agents, Gianelli and Griffen, returned to 232 Lowell to conduct the knock and talk. The house located at 232 Lowell is a split level-style ranch house set sideways on the lot. The front door is located on what would traditionally be regarded as one end of the house, and faces the street. There are two sets of windows in the front, one set located above the other. The upper set of windows looks out from the living area of the house, while the lower set looks out from the basement. On the right side of the house, as one is looking at the house from the street, there is a wooden elevated deck with a sliding glass door leading to the living area of the house. The sliding glass door and the deck face in the direction of Hartford Avenue, looking up Lowell Avenue. The testimony was devoid of evidence as to how clearly, and how far, one can see from the sliding glass door and deck of 232 Lowell, or from the windows in the front of the house up Lowell Avenue toward Hartford Avenue. Morrissey was asked the following question which did little to clarify this important point:

Q. When you approached the front door of the house, did you notice— did you pass any trees, shrubs or a fence at that point?

A. No, it was an open yard, there were no [trees] from the street to the front door that I observed at all, it was very open.

*Id.* at 30–31. In fact there was no testimony from any witness to indicate that one could see the location of the stop and arrest of Lopez from either the sliding glass door or the deck at 232 Lowell (or from any other vantage point inside the house).

Pictures introduced by defense counsel indicate that the sliding glass door on the deck is approximately ten feet from the corner of the house (Defendant's Exhibit L). Defendant's Exhibit A, a picture of the front of the house taken from an angle looking left to right toward the house, shows that a tall white house is located to the right of 232 Lowell. The height and breadth of this house would indicate that at least some of the view of Lowell Avenue toward Hartford is obstructed by the white house. In any event, the Government adduced no testimony and no exhibits whatsoever to indicate that either the sliding glass door or the front windows of 232 Lowell could be seen by Agents while they arrested Lopez, or that an observation was made at 232 Lowell subsequent to the entry to confirm that the location of the stop and arrest of Lopez could be viewed from the house. Given the number of witnesses available to the Government who could have testified on this subject, as well as the ease of obtaining pictures to demonstrate this critical fact, the Court can only conclude that the ability of the Defendant to observe the arrest of Lopez from the house at 232 Lowell was not established.

Agents Morrissey and Gianelli approached the front door of the house in order to conduct the knock and talk. Agent Griffen was detailed to the side of the house where the deck and sliding glass door are located. Agent Griffen proceeded up to the deck where he could look inside the house into the kitchen and upstairs living area.

Agent Morrissey knocked on the front door and announced that it was the police.

She heard unintelligible voices inside the residence. She waited, and then knocked again. At this point she heard someone say "hold on, hold on" which was followed by a long pause. Morrissey testified that she became concerned for her safety, the safety of the other Agents and the integrity of the cocaine which the Agents believed was located in the residence. Morrissey testified that one minute elapsed from the initial knock on the door to the point where she heard someone call "hold on." She testified that it was another twenty seconds or more when the door was opened by the Defendant.

When the Defendant opened the door, he peered out from around the door showing only his head. His hands and his waistband were not visible. At this point, Morrissey had her weapon out and in the "low ready" position meaning that the weapon was pointed in a downward angle. Morrissey ordered the Defendant to place his hands on the wall inside the door which was visible from the landing. When the Defendant complied, Morrissey placed her gun back in its holster. At this point the door was open and Agent Gianelli stepped inside the residence and conducted a brief pat down of the Defendant. Handcuffs were then placed on the Defendant. Morrissey testified that she told the Defendant she was placing handcuffs on him for her safety as well as for his.

At this point Morrissey asked the Defendant, "Are there narcotics in the residence?" to which the Defendant replied, "Yes, cocaine." Morrissey testified that the Defendant indicated the cocaine was in the bedroom. Morrissey asked the Defendant if he could show the Agents where the cocaine was, to which the Defendant replied "yes" and then led the officers up the stairs into the living area.

Sometime during this exchange with the Defendant, Agent Griffen, who had been stationed on the deck looking through the sliding glass door, entered the house through that door. It is not exactly clear at what point during the conversation between Morrissey and the Defendant that Agent Griffen chose to enter the house. His testimony was that he did so when he heard voices of the other DEA Agents inside the house. Agent Griffen immediately conducted a "protective sweep" of the upstairs portion of the house. Agent Griffen did not conduct a protective sweep of the downstairs of the house. When asked about this, Agent Griffen indicated that he did not know there was a downstairs part of the house.

Agent Morrissey arrived at the top of the stairs with Agent Gianelli and the Defendant and immediately observed the presence of cocaine on the kitchen counter. At this point she instructed the Defendant to take a seat at the kitchen/dining table. Agent Griffen was completing his protective sweep of the upstairs of the residence and within a brief period entered the kitchen area where Morrissey and Gianelli were located with the Defendant. Agents Morrissey and Griffen spoke with each other. Agent Griffen indicated that things were "all set," meaning that the residence was secured.[1] Agents Morrissey and Griffen both noticed that there was cocaine on the counter next to the "George Foreman cooker," and that a child was running around the area.

---

1. Curiously, as indicated above, Griffen did not secure the downstairs of the residence, and Morrissey did not make any inquiry or effort to determine whether the downstairs of the residence had been secured. It is unclear, at best, how a "protective sweep" could be effective if it leaves one entire floor of the house unsearched; and it is even more unclear how all three DEA Agents could not have noticed that the downstairs was not included in the security sweep.

At this point, the Defendant was placed under formal arrest and read his *Miranda* rights while sitting at the table. The *Miranda* rights were read from a card typically used for this purpose by DEA Agents.

Morrissey then asked the Defendant if drugs were located in the bedroom, indicating a specific bedroom down the hall from the living room/kitchen area. The Defendant replied that there were, and that they were located under the bed. Morrissey asked the Defendant how much cocaine there was and the Defendant replied five hundred grams. Morrissey then asked if she could look in the bedroom and the Defendant said yes.

Morrissey then walked to the bedroom and looked inside. She observed a bag sticking out from under the bed which appeared to contain cocaine. At this moment she decided she wanted to conduct a more thorough search of the residence and returned to the Defendant to obtain a signed *Miranda* waiver form and a consent to search form.

Because Morrissey did not have one or both of the forms with her, some time passed before one could be located in the vehicles of one of the other Agents. Ultimately, approximately thirty minutes later, both forms were executed by the Defendant. (*See* Government's Exhibits 2 and 3.)

At this point, a comprehensive search of the residence was conducted (including the downstairs). Cocaine was found in the bedroom, under the bed, as well as on the dresser and inside the dresser drawer.

In the basement area of the residence, Agents found ingredients for cutting cocaine including acetyl and acetone; a "turkey pan" with dried cocaine residue on it; a pill crusher and some rags. Further, in the kitchen, as indicated above, in plain view, was found a scale, a spoon with cocaine residue on it and cocaine on the counter top.

All evidence was secured and appropriately tested, proving positive as cocaine. After the securing of the evidence, the Defendant was transported to DEA offices in Providence. He was questioned further at this point and admitted that he had paid $10,000 down and owed $14,000 for the kilogram of cocaine. He further indicated that he had done this on three previous occasions.

*Analysis and Conclusions of Law*

The Defendant has launched a full frontal attack under the Fourth and Fifth Amendments in an attempt to suppress all evidence resulting from the search and interrogation of the Defendant and his home on April 26, 2003. In its defense, the Government contends, in somewhat alternative fashion, that the warrantless search of the Defendant's residence was justified by exigent circumstances, that the Defendant consented to the search of his residence, and that the incriminating statements made by the Defendant were not obtained in violation of the Fifth Amendment. Finally the Government argues that discovery of the evidence was inevitable in any event, thus negating any Fourth or Fifth Amendment violation.

The Fourth and Fifth Amendment violations claimed by the Defendant, while distinct, cannot be entirely separated from each other.[2] However, in order to address fully all of the challenges raised by the

---

2. In this case especially, and as the Supreme Court has noted in other cases, "the Fifth Amendment is in 'intimate relation' with the Fourth." *Brown v. Illinois*, 422 U.S. 590, 601, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (citing *Boyd v. United States*, 116 U.S. 616, 633, 6 S.Ct. 524, 533, 29 L.Ed. 746 (1886)).

Defendant, the Fourth Amendment and Fifth Amendment issues will be analyzed, to the extent possible, separately.

1. *Were Exigent Circumstances Present to Justify the Warrantless Entry Into the Defendant's Home?*

The Court begins with the basic premise that the warrantless entry into a person's home is presumed to be unconstitutional unless justified by exigent circumstances. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The First Circuit has instructed that "[e]xigent circumstances exist where law enforcement officers confront a 'compelling necessity for immediate action that [would] not brook the delay of obtaining a warrant.'" *United States v. Tibolt,* 72 F.3d 965, 969 (1st Cir.1995) (citing cases). Exigent circumstances that justify the warrantless search of a residence commonly include

> (1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [an occupant].

*Hegarty v. Somerset Cty.,* 53 F.3d 1367, 1374 (1st Cir.1995), *cert. denied,* 516 U.S. 1029, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995). The determination of whether an exigency exists sufficient to justify the warrantless entry of a home is a fact intensive one, and is "limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." *Tibolt,* 72 F.3d at 969, (citing *Illinois v. Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990)).

In this case, the Government claims that two distinct exigencies justified their warrantless entry into the house. First, the Government contends that the Agents rea-sonably feared that valuable evidence located inside 232 Lowell Avenue would be destroyed because the Defendant might have been able to observe the stop and arrest of Lopez nine houses away, or would have been informed of the arrest by neighbors. Second, the Government contends that concerns for officer safety justified all or part of the warrantless entry into the house. In this regard, it appears that the Government is suggesting that if the initial exigency regarding the concern over the destruction of evidence is not sufficient to justify the warrantless search, that officers would have been justified in entering the foyer of the house to conduct a security pat down of the Defendant because of the manner in which he opened the door; and further, that a security sweep of the premises was justified in order to ensure officer safety. Essentially, the Government argues that if the Court does not find exigency in the Agents' fear of discovery and destruction of evidence, then exigent circumstances derived from concern over officer safety justify the initial entry and pat down, while the remainder of the search was consented to by the Defendant. The Court will address these alternate arguments in turn.

a. *Did Concern Over the Possible Destruction of Evidence Constitute Exigent Circumstances?*

The Government asserts that Agents feared for the destruction of evidence at 232 Lowell Avenue from the moment that Lopez was stopped and arrested. It claims that this concern was reasonable and substantial enough to constitute exigent circumstances. On this point, the Government relies on *United States v. Edwards,* 602 F.2d 458 (1st Cir.1979). In *Edwards,* the court held that "the possibility that evidence will be destroyed by defendants *who have discovered government*

*surveillance* of their activities often has been recognized as a sufficient exigency to justify warrantless entry." 602 F.2d at 468 (emphasis supplied) (citing cases). The *Edwards* court indeed appears to hold that a legitimate fear by government agents that surveillance would be discovered and evidence destroyed before a search warrant could be obtained is a sufficient exigency to justify a warrantless entry into a home. However, the First Circuit in more recent cases has indicated that the determination of exigency requires more than merely a subjective fear by government agents. In *United States v. Veillette*, 778 F.2d 899 (1st Cir.1985) the court held:

> In determining whether the circumstances of a case fall into one of the emergency conditions characterized as exigent circumstances, the court must consider: the gravity of the underlying offense; whether delay poses a threat to police or the public safety; whether there is a *great* likelihood that evidence will be destroyed if there is a delay until a warrant can be obtained.

778 F.2d at 902 (emphasis in original) (citing *United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir.1985)). *Accord United States v. Curzi*, 867 F.2d 36, 41 (1st Cir. 1989). In this case, while the gravity of the offence is significant, it was not so substantial as to make look-outs likely, and the delay by itself cannot be said to pose a threat to police or the public. Thus, the question for this Court is whether there is evidence to support a finding that a "great likelihood" existed that evidence would be destroyed if officers delayed entry into the home in order to obtain a search warrant.

The evidence presented by the Government on this point is speculative and equivocal, at best. Agent Morrissey testified that she believed there was a "possibility" that the arrest of Lopez could be observed and that "maybe" it was observed. However, no evidence whatsoever was presented by the Government indicating, for example, that while 232 Lowell remained under surveillance (if it even was), that anyone was observed standing at a window looking down the street toward Hartford Avenue; that blinds were drawn; or that any other activity occurred that might, in some way, indicate observation of the arrest. Moreover, no evidence was adduced that the location of the arrest could actually be seen from 232 Lowell. The evidence that the Government attempted to introduce—that the view from the sliding glass door and window in the living area was unobstructed (presumably meaning the view up Lowell Avenue toward Hartford Avenue)—completely misses the mark. Essentially, Morrissey testified that there was an unobstructed view from the house to Lowell Avenue directly in front of the house, not up the street toward Hartford Avenue. If the view was in fact unobstructed to the point of the arrest, some testimony could and should have been elicited on this point. For example, Morrissey could have testified that she saw the sliding glass door or the front windows of 232 Lowell from the location of the arrest; or, conversely, an Agent could have testified that looking out from the sliding glass door or front windows one could observe the location of the arrest; or, pictures could have been introduced showing the view from the sliding glass door or other windows of the house to the point of the arrest.[3] Alas, however, none of this evidence was introduced. The

---

**3.** The Court notes that in an unrelated Motion to Suppress also before this writer for decision, *United States v. Montegio*, CR No. 03–005S, the Government introduced such photographs showing the view up and down the street on which the searched house was located.

Court is left merely with Morrissey's testimony that she was concerned that the arrest could be observed and/or that an (unspecified) neighbor might call Torres and inform him that someone leaving his house had been arrested up the street. In this writer's opinion, this quantum of evidence falls far short of the mark set by the First Circuit requiring the government to show a "great likelihood" that the evidence will be destroyed if there is a delay to obtain a warrant. The Government's reliance on generalized apprehensions or expectations of exigency is misplaced, as other courts in this circuit have noted. In *United States v. Hidalgo,* 747 F.Supp. 818 (D.Mass.1990), Judge Wolf held that, when drugs are involved, the First Circuit and other courts have required more than mere generalized statements or expectations to warrant entry into a home based solely on exigent circumstances.

> In narcotics cases in particular, [the First Circuit] and other courts have consistently found exigent circumstances to exist where there is *specific evidence* that a supplier of drugs has either detected police surveillance, or is acting nervously, or is expecting his confederate to return at a particular time and would therefore likely flee or dispose of the evidence if his arrested confederate did not return promptly. *See United States v. Moore,* 790 F.2d 13, 15–16 (1st Cir.1986) (arrested dealer stated supplier was apprehensive and was expecting him to return promptly with money); *United States v. Edwards,* 602 F.2d 458, 468 (1st Cir.1979) (suspected trafficker pointed towards surveillance team before entering house); *United States v. Socey,* 846 F.2d 1439, 1447 (D.C.Cir. 1988) (commotion on street caused by arrest may have alerted coconspirators in house; scale of drug operation made lookouts likely).

747 F.Supp. at 826 (emphasis added) (omitting cited cases).

■ Where the Government wants to hang its hat, there is no hook. Specific evidence is simply not present in this case. No matter how hard this writer tries, there is simply no way to read the evidence presented by the Government as anything other than a generalized fear with no factual basis to support it. This Court cannot and will not contort the record to find an exigency where none exists. Therefore, the Court finds that no exigency existed at the point of Lopez's arrest to justify the warrantless entry and search of the Defendant's home.

b. *Did Concern over Officer Safety Create an Exigency Sufficient to Justify the Warrantless Entry and Sweep?*

■ The Government argues that a second exigency justified its warrantless entry into the home. It asserts that the delay in answering the door by Defendant, and the manner in which he opened the door, concealing his hands and waistband, gave rise to a fear for officer safety. In response to that fear, the Agents entered the foyer, conducted a pat down, and engaged in a security sweep of one floor of the house. All of this, the Government claims, was justified by concern for safety (in addition to their concern for the integrity of the evidence). The Defendant argues that the Agents "manufactured" the circumstances which the Government claims to be exigent. Defendant contends that if the exigency was manufactured by the Agents it cannot justify the warrantless entry into the home, regardless of how real the concern of the Agents for their safety.

The Government relies on the closely analogous case of *United States v. Socey,* 846 F.2d 1439 (D.C.Cir.1988), in which the

court found, in very similar circumstances, that while the actions of the police were "possibly ill-advised," the court was not prepared, in hindsight, to second guess police measures as long as they were "not deliberately designed to invent exigent circumstances . . . ." 846 F.2d at 1449. However, the standard regarding manufactured exigency in the First Circuit is not quite so deferential to law enforcement. In *Curzi*, the First Circuit noted that where agents realized in advance that once they made their presence known to the occupant a security search would be necessary, the only relevant question is whether exigent circumstances justify the agents' *"initial decision* to reveal their presence." 867 F.2d at 43 (emphasis added). *Curzi* dealt with a similar factual situation where an FBI agent set the timetable and elected to reveal the agents' presence at a particular moment in time. The court found that exigent circumstances were lacking because there was no evidence to indicate that the occupants of the dwelling had discovered the surveillance. The decision to approach the house and identify their presence virtually guaranteed that a search would ensue. In a footnote, the court stated "[w]e concur with the Fifth Circuit that, without more, 'in the ordinary case the risk that a criminal suspect will become aware of covert surveillance is . . . insignificant in contrast to the more substantial benefits we all derive from the procedural safeguards of judicial process.'" 867 F.2d at 43 n. 7 (citing *United States v. Munoz–Guerra*, 788 F.2d 295, 299 (5th Cir.1986)).

In this case, this means that if exigent circumstances are to justify the warrantless entry into the house, they must be found at the time the decision was made to conduct a "knock and talk." As in *Curzi* and *Munoz–Guerra*, there is no question that once the officers revealed their presence by knocking at the door, a search in

the nature of a security sweep would be necessary in order to secure the premises and the evidence. Thus, absent exigency to approach the house, any subsequent exigency that exists after the knock and announce at the door is clearly manufactured and cannot justify the warrantless entry into the home. Inasmuch as this Court has found that the evidence provided by the Government at the point of the decision to conduct the "knock and talk" did not constitute exigent circumstances sufficient to justify a warrantless entry into the home, the Government's second argument fails.

### c. *Was there Consent to Search?*

The Government alternatively contends that despite the DEA's entry into Torres' home in violation of the Fourth Amendment, the drug evidence should not be suppressed because Torres consented to the search of the remainder of his home. It asserts that this consent was sufficiently attenuated from the initial, illegal entry so as to make the discovery of drugs and other evidence comport with the Fourth Amendment.

■ " '[O]ne of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.' " *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir.2002) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). However, when the consent flows from a violation of the Fourth Amendment, such as an illegal search, a court must determine whether the "causal connection" between the Fourth Amendment violation and the consent has been broken. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Quinn*, 815 F.2d 153, 164 (1st Cir.1987). This is true even

in cases in which *Miranda* warnings have been provided to the Defendant prior to obtaining consent. *See Brown v. Illinois,* 422 U.S. 590, 601–602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). If the Government can show the proper attenuation, then remote "fruits" of the unlawful search should not be suppressed. *United States v. Hughes,* 279 F.3d 86, 89 (1st Cir.2002). However, if the Government cannot establish a break in the causal connection, then the Fourth Amendment's exclusionary rule still requires that the evidence be suppressed despite the consent. The remote, physical "fruits" at issue in this case are the drugs located in the bedroom under the bed, on a dresser, and inside a dresser drawer, as well as drug paraphernalia found in the basement.

■ The Court declines to apply the attenuation doctrine in this case. The DEA placed Torres in handcuffs immediately following the unlawful entry into his home. Although approximately thirty minutes elapsed between Torres' arrest and the provision of consent, the Defendant remained in handcuffs during that time and the Agents continued to ask him questions regarding the location of the drugs. The delay, which was insubstantial, was a result of the fact that none of the Agents present had the requisite forms on their person, and so they had to be retrieved from a vehicle. Accordingly, this Court finds that Torres' consent was not sufficiently attenuated from the illegal entry of his home so as to remove the taint of the Fourth Amendment violation.

### 2. *Are the Statements of the Defendant Suppressible?*

■ Torres also seeks to suppress any statements made as a result of the illegal

search. In *Wong Sun,* the Supreme Court made clear that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest ... is no less the 'fruit' of official illegality then the more common tangible fruits of the unwarranted intrusion." 371 U.S. at 485, 83 S.Ct. 407 (citing *Nueslein v. District of Columbia,* 115 F.2d 690 (D.C.Cir.1940)). Yet, as with physical evidence, the attenuation doctrine permits introduction of the statements if they are sufficiently attenuated from the unlawful entry so as to dissipate the taint. *See Brown,* 422 U.S. at 601–602, 95 S.Ct. 2254. *Wong Sun* compels the Court to consider the temporal proximity of the search and the statements, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. 371 U.S. at 491, 83 S.Ct. 407.

First, Torres contends that the statements made during the search of his home must be suppressed. Torres' statements regarding the presence of drugs in the house flow directly from the illegal search of the premises. Indeed, many of the incriminating statements made during the DEA's search related to his possession of the drugs, and their location. Without the illegal search, these statements never would have been elicited. It is true that Torres was given a *Miranda* warning during this time, but that warning alone is insufficient to create attenuation. *See Brown,* 422 U.S. at 602, 95 S.Ct. 2254 (holding that *Miranda* warnings, by themselves, are insufficient to attenuate the taint of Fourth Amendment violations).[4] Moreover, the statements all appear to have occurred within the thirty minutes

---

4. "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." *Brown,* 422 U.S. at 602, 95 S.Ct. 2254.

immediately following entry of the home. Therefore, the statements' temporal proximity to the illegal entry is not so remote as to justify application of the attenuation doctrine. Consequently, this Court holds that Torres' statements are not sufficiently attenuated from the unlawful entry of his home, despite the *Miranda* warning, and therefore must be suppressed as fruits of the Fourth Amendment violation.[5]

Second, Torres also contends that his statements elicited at DEA headquarters should be suppressed. Again, unless the taint from the illegal search at 232 Lowell is sufficiently attenuated, Torres' statements at the station must be suppressed. *Wong Sun,* 371 U.S. at 491, 83 S.Ct. 407. As with the statements elicited at 232 Lowell, *Wong Sun* requires that this Court analyze the statements elicited at DEA headquarters in light of their temporal proximity to the illegal search, any intervening circumstances that might have occurred, and the purpose and flagrancy of the official misconduct. *Id.* at 491, 83 S.Ct. 407.

While the precise amount of time that elapsed between the illegal search and the questioning at DEA headquarters was not established, it appears to have been only a few hours. The agents entered the home at approximately 1:00 p.m. and departed at approximately 3:45 p.m. to return to headquarters. Depending on the exact time Torres was questioned, the statements could not have been elicited more than three to fours following the illegal search. While no specified amount of time is required to purge the taint of an illegal search, courts have held that the more

significant an intervening period of time, the more likely a taint has been purged. *See, e.g., United States v. Crawford,* 323 F.3d 700, 719 (9th Cir.2003). This Court does not find that the elapse of time in this case to be significant enough, in and of itself, to purge the taint of the illegal search.

With respect to *Wong Sun's* intervening circumstances prong, this Court cannot find any intervening circumstances other than the collection of the evidence and the transport to DEA headquarters. These events are of course not sufficient to purge the initial taint. Finally, while the Court finds that the officers' warrantless entry into the home was not malicious, it was not benign enough to remove the taint of its illegality. Therefore, Torres' statements made at the house as well as at DEA headquarters must be suppressed as poisonous fruits of the Fourth Amendment violation.

3. *Does the Inevitable Discovery Doctrine Allow the Evidence to be Received in Spite of the Fourth Amendment Violation?*

The Government contends that, despite the Fourth Amendment violations, the drug evidence should not be suppressed under the inevitable discovery exception to the exclusionary rule. The Government argues that because it had probable cause to suspect illegal drug activity was ongoing at 232 Lowell, it could have obtained a warrant and therefore it was inevitable that the drugs would have been discovered. This Court disagrees.

---

**5.** The Court need not address the Defendant's argument that these statements should also be suppressed due to violations of the Fifth Amendment since the statements are suppressed under the Fourth Amendment's exclusionary rule. Moreover, the physical evidence would not be suppressed as fruits of the

Fifth Amendment violation because the First Circuit has explicitly held that physical evidence obtained as a result of a *Miranda* violation are not "fruits" worthy of suppression. *See United States v. Faulkingham,* 295 F.3d 85, 93 (1st Cir.2002).

The Supreme Court first adopted the inevitable discovery doctrine in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The Court held that information obtained by unlawful means is nonetheless admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. 2501. In *Nix,* the police persuaded a criminal defendant to inform them where the body of a child the defendant had murdered was located. *Id.* at 435–36, 104 S.Ct. 2501. The interrogation, which occurred after the defendant had been arraigned and had retained counsel, violated the defendant's Sixth Amendment right to counsel. *Id.* The Court concluded that if the government could prove that the evidence inevitably would have been discovered by legal means then "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444, 104 S.Ct. 2501. In this circuit, the term "inevitable" has been defined as "a *high probability* that the evidence would have been discovered by lawful means." *United States v. Rogers,* 102 F.3d 641, 646 (1st Cir.1996) (emphasis added).

The First Circuit set forth its analytical framework for applying the inevitable discovery rule in *United States v. Silvestri,* 787 F.2d 736 (1st Cir.1986). In *Silvestri,* police officers unlawfully searched the defendant's residence and discovered large quantities of drugs. Other officers, who had not participated in the unlawful entry, prepared a search warrant affidavit without any knowledge of the illegal search. Following issuance of the warrant, the premises were then lawfully searched and evidence was seized. The defendant moved to suppress the evidence, but the district court denied the motion holding it to be admissible under the inevitable discovery rule. On appeal, Silvestri argued that *Nix* held that the inevitable discovery exception applies only where the legal process for discovering evidence has already been set in motion at the time of the illegal discovery. *Id.* at 742. The court, however, analyzed *Nix* and concluded that the Supreme Court had not indicated whether the legal means of obtaining the evidence must be in progress at the time the evidence was illegally discovered. *See id.*

Several circuits have adopted the approach urged by the defendant in *Silvestri,* dubbed the "active pursuit" requirement. *See United States v. Owens,* 782 F.2d 146 (10th Cir.1986); *United States v. Cherry,* 759 F.2d 1196, 1204 (5th Cir.1985); *United States v. Satterfield,* 743 F.2d 827 (11th Cir.1984). The *Silvestri* court analyzed these active pursuit cases, along with the holding of *United States v. Finucan,* 708 F.2d 838 (1st Cir.1983), in which the First Circuit previously had held that the "mere fact that illegally obtained documents *could have been* lawfully subpoenaed by the grand jury was not sufficient to allow application of the inevitable discovery exception." 787 F.2d at 743. The *Silvestri* court stressed that "in *Finucan* there were no legal efforts to obtain the documents prior to the illegal seizure nor sufficient proof that such lawful efforts would have been pursued and pursued successfully." *Id.* at 743–744.

From these decisions, the *Silvestri* court extracted three questions that must be considered when applying the inevitable discovery doctrine to situations where there has been police misconduct, but in which active pursuit of legal means of discovery is also present: (1) whether the legal means are truly independent; (2) whether the use of the legal means and the discovery by that means are truly inevitable; and (3) whether the application of the inevitable discovery exception provides

either an incentive for police misconduct or significantly weakens Fourth Amendment protection. 787 F.2d at 744.

The *Silvestri* court rejected, however, the argument that active pursuit at the time of the Fourth Amendment violation should be a bright-line rule. In doing so, the court distinguished between warrantless searches that are followed by a warranted search and warrantless searches that are never followed by a warrant. *Id.* at 744. In warrantless search cases where no warrant is ever obtained, such as the case *sub judice,* the court held that concerns over inevitability and weakening of the Fourth Amendment are more pronounced than in cases where a warrant is eventually obtained.

> [T]he application of the inevitable discovery rule where no warrant is in fact obtained would substitute proof by a preponderance of the evidence that a warrant could and would have been obtained for the requirement of the fourth amendment that a warrant must in fact be obtained through a neutral and detached magistrate prior to a search. Such an approach substantially weakens the protection provided by the fourth amendment.

*Id.* at 744–745. On the other hand, the *Silvestri* court held that when warrantless searches are followed by a warranted search, "[t]he fact that a warrant has been obtained removes speculation as to whether a magistrate would in fact have issued a warrant on the facts and also ensures ... that the fourth amendment has not been totally circumvented." *Id.* at 745.

■ Despite the clarity of the active pursuit requirement in warrantless search cases, the First Circuit determined that its adoption as a per se requirement was not necessary to ensure the independence and inevitability of subsequent discovery. *Id.* Instead, the court held that the inevitable

discovery analysis should remain flexible enough to handle a wide range of fact patterns, more realistically reflecting actual law enforcement activities. *Id.* Nonetheless, the court held that the active pursuit requirement may be used by courts to help determine the independence and inevitability of a subsequent discovery. *Id.* at 746 ("A *Nix*-like case may well require that active pursuit of the investigation be underway to satisfy the test of inevitability and independence. This requirement may also be appropriate in illegal search cases where no warrant is ever obtained."). In other words, in warrantless search cases, evidence of "historical facts beyond mere speculation" that the government intended to obtain a search warrant, or had begun to obtain one, may prove that subsequent discovery of the evidence was indeed inevitable. *Id.* at 745.

■ In this case, the Government has not demonstrated any facts to support its argument that an independent discovery of the drugs was inevitable. At the suppression hearing, the Government elicited testimony from Agent Morrissey indicating that the DEA had probable cause to suspect illegal activity at 232 Lowell Avenue. However, despite the Government's arguments to the contrary, mere evidence of probable cause is not sufficient to comply with *Silvestri's* cornerstone requirements of independence and inevitability. In addition to probable cause, the Fourth Amendment requires the intervention of a neutral and detached magistrate. Here, the record is completely devoid of *any* evidence indicating that the DEA even considered obtaining a warrant.

The Government contends that the First Circuit does not *require* that efforts to obtain a search warrant be underway in order for the doctrine to apply. This is correct as far as it goes. In *United States v. Ford,* 22 F.3d 374 (1st Cir.1994), the

First Circuit reiterated its holding in *Silvestri* that, unlike in other circuits, there is no bright-line rule in the First Circuit requiring the Government actively to be pursuing a search warrant, or even to have made the decision to obtain a search warrant, at the time of the unlawful search. *Id.* at 378. However, *Ford* in no way precludes a court from considering the DEA's decision or efforts to obtain a warrant, or the failure to do so, in a particular case (either simultaneously with or after the illegal search) when evaluating the independence and inevitability of a discovery. As the *Silvestri* court held, this consideration is especially relevant in warrantless search cases where no warrant is ever obtained.

Unlike in *Ford* and *Silvestri*, the investigating authorities in this case never obtained a warrant, nor was there any evidence that the DEA ever intended to or even contemplated obtaining a warrant to search 232 Lowell. This Court concedes, as the Fourth Circuit has noted, that "[a] finding of inevitable discovery necessarily rests on facts that did not occur." *United States v. Allen,* 159 F.3d 832, 840 (4th Cir.1998). However, "post hoc suggestions of alternate legal means will not be accepted as a basis for application of the inevitable discovery exception." *Silvestri,* 787 F.2d at 746. This Court has no evidence

before it whatsoever that the DEA would have gone to a neutral and detached magistrate as the Fourth Amendment requires.[6] For this Court to hold that the DEA would have (or could have) obtained a warrant in this case based on the evidence in the record would require engaging in precisely the type of speculation that *Silvestri* warned against. *Id.* at 745. The inevitable discovery doctrine was developed to alleviate "formalistic" and "pointless" applications of the exclusionary rule, *Nix,* 467 U.S. at 445, 104 S.Ct. 2501, but it does not, nor can it, eliminate or substitute for the requirements of the Fourth Amendment. The Government would have this Court hold that so long as there was probable cause to obtain a warrant at the time of the illegal entry, the failure to secure one is excused. This substitutes the probable cause standard for the Fourth Amendment warrant requirement. The *Silvestri* court explicitly instructed against this. There can be no dispute but that to apply the inevitable discovery doctrine under the facts of this case would significantly weaken Fourth Amendment protections.[7]

Accordingly, this Court must reject the Government's argument that the inevitable discovery doctrine prevents the application

---

**6.** At oral argument, the Government stated "[c]learly, nobody was getting a warrant; there was no warrant at any time that was obtained to enter the house. That's been conceded by the Government, made patently clear." Transcript, July 9, 2003, p. 34, lines 15–18.

**7.** This Court notes that on this point courts as traditionally divergent as the Fourth and Ninth Circuits agree. *See Allen,* 159 F.3d at 841 ("The existence of probable cause for a warrant, in and of itself and without any evidence that the police would have acted to obtain a warrant, does not trigger the inevitable discovery doctrine ...."); *United States*

*v. Mejia,* 69 F.3d 309, 320 (9th Cir.1995) ("If evidence were admitted ... simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant. To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement."); *accord, United States v. Felix,* 134 F.Supp.2d 162, 175 (D.Mass.2001) ("[A]n officer cannot justify a warrantless search on the ground that she *could have* obtained a warrant—she had the requisite probable cause and time to obtain one—but she did not take any steps to do so.").

of the exclusionary rule resulting from the Fourth Amendment violation in this case.

*Conclusion*

Based on the foregoing analysis, the Court orders as follows:

1. Defendant's Motion to Suppress the physical evidence obtained during the search of 232 Lowell Avenue on April 26, 2003 is GRANTED;

2. Defendant's Motion to Suppress all statements elicited from Torres is GRANTED.

IT IS SO ORDERED,